[No. A123316. First Dist., Div. Four. July 15, 2010.]

RIVER GARDEN RETIREMENT HOME, Plaintiff and Appellant, v. FRANCHISE TAX BOARD, Defendant and Respondent.

928

COUNSEL

Silverstein & Pomerantz, Amy L. Silverstein and Edwin P. Antolin for Plaintiff and Appellant.

Edmund G. Brown, Jr., Attorney General, Joyce H. Hee and David Lew, Deputy Attorneys General, for Defendant and Respondent.

OPINION

**REARDON, J.**—For years Revenue and Taxation Code section 24402[1] allowed California corporate taxpayers to deduct a portion of the dividends

---

[1] All statutory references are to the Revenue and Taxation Code.

Section 24402 provides a deduction in computing taxable income for "[a] portion of the dividends received during the taxable year declared from income which has been included in the measure of the taxes imposed under Chapter 2 [(corporation franchise tax)] . . . , Chapter 2.5 [(alternative minimum tax)] . . . , or Chapter 3 [(corporation income tax)] . . . upon the taxpayer declaring the dividends." (§ 24402, subd. (a).)

Subdivision (b) limits the portion of dividends which may be deducted, as follows: "(1) In the case of any dividend . . . received from a 'more than 50 percent owned corporation,' 100 percent. [¶] (2) In the case of any dividend . . . received from a '20 percent owned corporation,' 80 percent. [¶] (3) In the case of any dividend . . . received from a corporation that is less than 20 percent owned, 70 percent." (§ 24402, subd. (b).)

they received from another corporation when those dividends were included in the payer's measure of California franchise, income, or alternative minimum tax. The court in *Farmer Bros. Co. v. Franchise Tax Bd.* (2003) 108 Cal.App.4th 976, 980, 986–987 [134 Cal.Rptr.2d 390] (*Farmer Bros.*) held that section 24402 violates the commerce clause of the United States Constitution by allowing the dividends received deduction where the dividend-paying corporation was subject to California tax, but disallowing it where such corporation was not subject to California tax.

Appellant River Garden Retirement Home (River Garden or the company) claimed the dividends received deduction for tax years 1999 and 2000, but, in the wake of *Farmer Bros.*, respondent Franchise Tax Board (FTB) disallowed the deductions for tax years ending on or after December 1, 1999, and issued notices of proposed assessment for additional tax for the two years at issue in this case. As well, the FTB imposed an amnesty penalty under California's tax amnesty program[2] because River Garden did not pay the tax deficiencies announced in those notices until two years after the close of the amnesty period. Section 19777.5, subdivision (a)(2) subjects eligible taxpayers, such as River Garden, that did not participate in the amnesty program to a penalty on amnesty-eligible deficiency assessments that remain "due and payable" after the close of the amnesty period. After unsuccessfully pursuing administrative remedies, River Garden sued for the refund of California tax and tax penalties, losing below.

Contrary to River Garden's assertions on appeal, we conclude, among related points, that section 24402 cannot be saved by severance of the offending language or by reformation. Moreover, the FTB proceeded with proper authority to remedy the commerce clause violation infecting section 24402, and the remedy of disallowing the dividends received deductions for the years at issue did not defy the due process prohibition against excessively retroactive tax increases. As well, the FTB's decision to recoup the deductions for those years did not run afoul of article XIII A, section 3 of the California Constitution requiring a two-thirds vote of the Legislature to enact revenue-increasing tax laws.

On the amnesty front, we hold that the deficiency assessments for tax years 1999 and 2000 were "due and payable" within the meaning of section 19777.5, thereby empowering the FTB to assess amnesty penalties for those years. Additionally, section 19777.5 does not operate retroactively, and therefore imposition of the amnesty penalty does not raise due process concerns. Finally, there is no statute of limitations bar to imposing the amnesty penalty for the 1999 tax year. Accordingly, we affirm the judgment in its entirety.

---

[2] Section 19730 et seq.

## I. FACT SUMMARY

River Garden, a California corporation, operates a retirement home in Lodi. The company received dividends in 1999 and 2000 in the respective amounts of $46,271 and $55,025. River Garden deducted 80 percent of the dividends it received in those years on its California tax returns, pursuant to section 24402.

On audit, FTB disallowed 100 percent of the dividends received deduction which River Garden claimed for those years on grounds that *Farmer Bros.* declared section 24402 unconstitutional and invalid. Implementing that decision, the FTB announced that it would allow section 24402 deductions for tax years ending prior to December 1, 1999, but disallow them for tax years ending on or after December 1, 1999. In keeping with this policy, in April 2004 the FTB issued to River Garden notices of proposed assessment in the amounts of $2,666.08 (1999) and $2,704.18 (2000). River Garden protested the notices, the FTB published notices of action affirming them, and thereafter in December 2004, River Garden appealed to the State Board of Equalization.

Meanwhile, California's tax amnesty program went into effect in February 2005 while River Garden's administrative appeal was pending. The amnesty program afforded taxpayers a two-month window (Feb. 1, 2005, through Mar. 31, 2005), to apply for amnesty and thereafter pay in full all outstanding tax liabilities and interest for tax years prior to January 1, 2003, thereby avoiding tax penalties, fees and possible criminal action. (§§ 19731–19733.) River Garden was aware of the tax amnesty program, but did not remit payment to the FTB during the two-month window of any portion of the tax deficiencies assessed against it for the years in question.

The State Board of Equalization affirmed the FTB's notices of action in September 2006. There followed a series of notices from the FTB to River Garden: (1) January 18, 2007 notice of balance due for tax, interest and penalty totaling $8,844.53; (2) March 23, 2007 corporation past due notice for tax, interest and penalty totaling $8,969.46; and (3) April 27, 2007 corporation formal demand for tax, interest and penalty in the amount of $9,038.51. On May 9, 2007, River Garden remitted the full amount, which included an amnesty penalty pursuant to section 19777.5 for failure to participate in the tax amnesty program and clear the unpaid tax and interest. Thereafter the company filed a claim for refund, the FTB denied the claim, and River Garden sued for a refund of the tax assessments as well as the amnesty penalties. The trial court sustained the FTB's demurrer to River Garden's challenge to the tax assessment, and subsequently granted summary judgment in the FTB's favor on the challenge to the amnesty penalty. This appeal followed.

## II. DISCUSSION

### A. *Section 24402 Deduction*

In its opening brief, River Garden argues that we should preserve section 24402 by severing the portion of the statute that unconstitutionally limits the dividend deduction to those dividends paid from California sources. After the brief was filed, the Court of Appeal in *Abbott Laboratories v. Franchise Tax Bd.* (2009) 175 Cal.App.4th 1346 [96 Cal.Rptr.3d 864] (*Abbott*) persuasively rejected this proposition. River Garden contends in its reply brief that the *Abbott* court got it wrong. Now conceding that section 24402 has been "conclusively determined to be unconstitutional, and that question is no longer in issue," River Garden frames the question presented on appeal this way: "[W]hat is the proper remedy for River Garden for the years at issue?" Its attempt to recycle severance as *the remedy* for curing section 24402 of its unconstitutionality is not persuasive because the substance of the argument is the same. Nevertheless, River Garden is correct that the ultimate issue is articulating the proper remedy. Before reaching that issue, some background on the statute's constitutional infirmity and its insusceptibility to salvation by separability is in order.

### 1. *Background*

We start with *Farmer Bros.* There, the taxpayer filed state tax returns claiming a dividends received deduction for all dividends it received for the years at issue, regardless of whether the dividend-paying corporation paid California taxes or not. The taxpayer sought refunds totaling more than $800,000 plus interest, asserting that section 24402 contravened the "dormant" commerce clause[3] because on its face the statute discriminates against interstate commerce by improperly taxing income that is not attributable to business taking place in this state, and the deduction could not be justified as a lawful compensatory tax. The trial court agreed, declaring that section 24402 facially and unconstitutionally burdens interstate commerce. It awarded refunds of $811,000 plus interest and costs. On appeal the FTB challenged the substantive ruling that section 24402 is unconstitutional, but did not attack the remedy. (*Farmer Bros., supra*, 108 Cal.App.4th at pp. 983–985.)

---

[3] The United States Constitution grants Congress the power to regulate commerce between the states. (U.S. Const., art. I, § 8, cl. 3.) Although the commerce clause is phrased "as a grant of regulatory power to Congress, [it] has long been understood to have a 'negative' aspect that denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce." (*Oregon Waste Systems, Inc. v. Department of Environmental Quality of Ore.* (1994) 511 U.S. 93, 98 [128 L.Ed.2d 13, 114 S.Ct. 1345].)

■ Affirming, the *Farmer Bros.* court first pointed out that the dormant commerce clause "prohibits economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." (*Farmer Bros., supra,* 108 Cal.App.4th at pp. 985–986.) ■ Section 24402 favors dividend-paying companies that do business in California and pay California taxes over dividend-paying companies that do not do business in California and pay no taxes here. Thus, the deduction discriminates between transactions based on an interstate element, branding it facially discriminatory under the commerce clause. (*Farmer Bros., supra,* at pp. 986–987.) Specifically, the discriminatory impact of this scheme operates to favor domestic corporations over their foreign competitors in raising capital among California residents, and by the same token tends to discourage domestic corporations from plying their business in interstate commerce. (*Id.* at pp. 987–988; accord, *Ceridian Corp. v. Franchise Tax Bd.* (2000) 85 Cal.App.4th 875, 883–887 [102 Cal.Rptr.2d 611] (*Ceridian*) [concluding that § 24401, which allows deduction for insurance subsidiary dividends only to corporations domiciled in Cal., and limits amount of deduction pursuant to formula based on subsidiary's gross receipts, payroll and property within state, was discriminatory on its face, in violation of commerce clause].)

Like the plaintiff in *Abbott,* River Garden initially proposed that we rewrite section 24402, subdivision (a) to sever its invalid segment. It now advocates severance as *the remedy* required by state law. Indeed, section 23057 does allow for severance, as follows: "If any . . . subsection, clause, sentence or phrase of this part which is reasonably separable from the remaining portions of this part, or the application thereof to any person, taxpayer or circumstance, is for any reason determined unconstitutional, such determination shall not affect the remainder of this part, nor, will the application of any such provision to other persons, taxpayers or circumstances, be affected thereby."

The *Abbott* plaintiff argued that the statute should be revised to delete everything after "year," so that section 24402, subdivision (a) would read: " '(a) A portion of the dividends received during the taxable year.' " (*Abbott, supra,* 175 Cal.App.4th at p. 1357.) With this revision, the statute would allow a deduction in computing taxable income for dividends declared from the income of *any* corporation, regardless of whether its income was subject to California tax or not. The court in *Abbott* explained why such a revision is not constitutionally feasible.

■ While a severability clause such as section 23057 normally calls for sustaining the valid portion of the law when the invalid portion is mechanically severable, severability in these circumstances is not conclusively dictated. "To be severable, ' "the invalid provision must be grammatically, functionally, and volitionally separable." ' " (*Abbott, supra,* 175 Cal.App.4th

at p. 1357.) An offending clause is volitionally separable where the remainder of the statute (1) is complete in itself and would have been adopted by the legislative body had it foreseen the statute's partial invalidation, or (2) comprises a completely operative expression of legislative intent. (*Id.* at p. 1358.)

The legislative history of section 24402 reveals that the intent of the original 1929 enactment[4] was to permit a deduction for dividends received by a corporation from other corporations, *to the extent the dividends were based on business done in California*, the idea being to avoid taxing the same dollar of corporate income more than once. (*Abbott, supra*, 175 Cal.App.4th at p. 1358, citing Nelson, *California's New Tax Laws; Corporation and Bank Tax Explained* (Apr. 1929) 7 The Tax Digest 129 [by State Sen. H.C. Nelson]; see also *Safeway Stores, Inc. v. Franchise Tax Board* (1970) 3 Cal.3d 745, 749–750 [91 Cal.Rptr. 616, 478 P.2d 48]; *Burton E. Green Inv. Co. v. McColgan* (1943) 60 Cal.App.2d 224, 232–233 [140 P.2d 451].) Thus, as enacted, section 24402, subdivision (a) confined the dividends received deduction to those dividends declared from income subject to California tax. To excise the language imposing this limitation on the dividends received deduction would impart a purpose to the statute that is quite different from the one enacted by the Legislature. (*Abbott, supra*, 175 Cal.App.4th at p. 1359.)

■ Apart from the authority to sever under a severability clause, courts also have the power to reform a statute to preserve its constitutionality. We may rewrite a statute to cure constitutional invalidity when we can assert confidently that " '(i) it is possible to reform the statute in a manner that closely effectuates policy judgments clearly articulated by the enacting body, and (ii) the enacting body would have preferred the reformed construction to invalidation of the statute.' " (*Ceridian, supra*, 85 Cal.App.4th at p. 889.) By heeding these factors, courts can steer clear of judicial policymaking disguised as statutory reformation, and thereby avoid impinging on the legislative function in violation of separation of powers principles. (*Kopp v. Fair Pol. Practices Com.* (1995) 11 Cal.4th 607, 661 [47 Cal.Rptr.2d 108, 905 P.2d 1248].)

---

[4] The 1929 predecessor statute to section 24401, stated: "In computing 'net income' the following deductions shall be allowed: [¶] . . . [¶] (h) Dividends received during the taxable year from income arising out of business done in this state; but if the income out of which the dividends are declared is derived from business done within and without this state, then so much of the dividends shall be allowed as a deduction as the amount of the income from business done within this state bears to the total business done. [¶] The burden shall be on the taxpayer to show that the amount of dividends claimed as a deduction has been received from income arising out of business done in this state." (Stats. 1929, ch. 13, § 8, pp. 21–23.)

■ Courts consistently have declined to engage in judicial reformation when the statute at issue is a tax statute that defies the commerce clause. (*Ventas Finance I, LLC v. Franchise Tax Bd.* (2008) 165 Cal.App.4th 1207, 1224–1225 [81 Cal.Rptr.3d 823], and cases cited therein.) ■ Here judicial reformation is improper because the proposed reform is inconsistent with the Legislature's intent. To reiterate, the purpose of section 24402, as gleaned from the predecessor statute and its legislative history, is to avoid double taxation at the corporate level of income which has been subjected to California taxation in the hands of the dividend-declaring company. The proposed rewrite would not closely effect this policy, as clearly articulated by the enacting body, because it would not restrict the dividends received deduction to dividends declared from income already subject to tax in this state. To the contrary, the rewrite would go against the legislative policy by allowing a deduction for dividends declared from income of *any* corporation, regardless of whether that corporation paid taxes in California. (*Abbott, supra,* 175 Cal.App.4th at p. 1361.) Further, we have no reason to believe with any confidence that the 1929 Legislature would have preferred a global deduction from whatever corporate source, and thus we will not encroach on the legislative function by making a tax policy disguised as statutory reformation. (*Ibid.*)

## 2. *Remedy*

### a. *McKesson Corp. v. Florida Alcohol & Tobacco Div.*

■ Constitutional tax refund cases implicate the competing interests of taxpayers who seek a refund of wrongfully exacted taxes, versus the government in its efforts to protect the public purse. In *McKesson Corp. v. Florida Alcohol & Tobacco Div.* (1990) 496 U.S. 18 [110 L.Ed.2d 17, 110 S.Ct. 2238] (*McKesson*), the United States Supreme Court addressed the question of the remedy due a taxpayer who challenges the constitutionality of a state tax. There, a wholesale liquor distributor challenged Florida's liquor excise tax as contravening the commerce clause. The preferential tax gave special rate reductions for certain products commonly grown in Florida and used in alcoholic beverages produced there. The manufacturer paid the taxes, applied for a refund, and when that was denied, sought declaratory and injunctive relief and a refund of excess taxes paid.

The court framed the question as "whether prospective relief, by itself, exhausts the requirements of federal law." (*McKesson, supra,* 496 U.S. at p. 31.) The answer was a resounding "no." "If a State places a taxpayer under duress promptly to pay a tax when due and relegates him to a postpayment

refund action in which he can challenge the tax's legality,[5] the Due Process Clause of the Fourteenth Amendment obligates the State to provide meaningful backward-looking relief to rectify any unconstitutional deprivation." (*McKesson, supra,* 496 U.S. at p. 31, fn. omitted.) This response stemmed from previous cases establishing the rule that because exaction of a tax amounts to a deprivation of property, "the State must provide procedural safeguards against unlawful exactions in order to satisfy the commands of the Due Process Clause." (*Id.* at p. 36, fn. omitted.)

What, then, is "meaningful backward-looking" relief? When, as was the case in Florida, the state requires taxpayers to object to the tax in a postdeprivation refund suit, the state must give taxpayers both a "fair opportunity to challenge the accuracy and legal validity of their tax obligation" (*McKesson, supra,* 496 U.S. at p. 39, fn. omitted), as well as a " 'clear and certain remedy' " for the erroneous or unlawful tax collection (*ibid.*). Moreover, this duty to provide a " 'clear and certain remedy' " requires a state to make sure that the tax as ultimately *actually imposed* on the complaining taxpayer and its competitors during the contested tax period does not deprive the taxpayer of tax money in a way that discriminates against interstate commerce. (*Id.* at p. 43.) Refunding the difference between the tax McKesson paid and the tax it would have paid had it enjoyed favored rate reductions of course would constitute meaningful retrospective relief. Alternatively, consistent with constitutional limitations on retroactive assessments, Florida might assess and collect back taxes from McKesson's competitors who profited from the rate reductions during the periods in question. This approach would, in hindsight, erase the discriminatory effects of the tax scheme. (*Id.* at p. 40.) And finally, the state could devise a hybrid solution, partially refunding to taxpayers in the petitioner's shoes, and levying a partial retroactive tax on the favored competitors, "so long as the resultant tax actually assessed during the contested tax period reflects a scheme that does not discriminate against interstate commerce . . . ." (*Id.* at pp. 40–41.)

█ The Supreme Court made it clear that when the tax scheme is pronounced unconstitutional because it discriminates against interstate commerce, the taxing entity "retains flexibility in responding to this determination" and may reformulate and enforce the tax during the contested tax period

---

[5] The court went to lengths to underscore that Florida did not provide taxpayers like McKesson with any meaningful opportunity to withhold contested tax assessments and challenge their validity in a predeprivation hearing. The availability of such a hearing would constitute a procedural safeguard against unlawful deprivation sufficient to satisfy federal due process concerns. (*McKesson, supra,* 496 U.S. at pp. 36–39 & fn. 21.) Instead, the state had devised a variety of sanctions and summary remedies such that the liquor distributors would tender payments before their objections were addressed and resolved. Payments tendered under such schemes are deemed paid under duress because they are made to avoid financial sanctions or seizure of property. (*Id.* at p. 38, fn. 21.)

"in any way that treats [the taxpayer] and its competitors in a manner consistent with the dictates of the Commerce Clause. Having done so, the [taxing entity] may retain the tax appropriately levied upon [the taxpayer] pursuant to this reformulated scheme because this retention would deprive [the taxpayer] of its property pursuant to a tax scheme that is valid under the Commerce Clause." (*McKesson, supra*, 496 U.S. at pp. 39–40, italics omitted.)

Remanding the cause to the Florida Supreme Court for further proceedings, the court underscored that the state was free to fashion an appropriate remedy consistent with the minimum due process requirements articulated in its decision. (*McKesson, supra*, 496 U.S. at pp. 51–52.)

### b. *FTB Action*

When, as here, a court declares a statute unconstitutional and that statute cannot be reformed, the statute is void in the sense that it is inoperative and unenforceable. (*Kopp v. Fair Pol. Practices Com., supra*, 11 Cal.4th at pp. 623–624.) In the wake of the *Farmer Bros*. decision declaring section 24402 unconstitutional, the FTB took the position that the statute was invalid and unenforceable for all years. Crafting a suitable remedy, it announced that all dividends received from noninsurance corporations would be deductible subject to the ownership limits of section 24402, subdivision (b) for tax years ending before December 1, 1999. On the other hand, the deduction would be disallowed for all tax years ending on or after that date. This solution removed the discriminatory tax treatment and restored equality to the taxing scheme by retroactively recouping the favored deduction from all taxpayers for the contested tax years in question, namely tax years on or after December 1, 1999, and allowing a full dividends received deduction for taxpayers for years prior to that date.

The FTB fashioned its remedy pursuant to section 19393.[6] This statute directs that when a deduction is declared constitutionally invalid or discriminatory, the FTB shall recompute the tax of the favored taxpayer for

---

[6] Section 19393 reads: "For the purposes of the tax imposed under Chapter 2 (commencing with Section 23101) of Part 11, if any deduction, credit or exclusion provided for in Part 10 (commencing with Section 17001) or Part 11 (commencing with Section 23001) is finally adjudged discriminatory against a national banking association contrary to Section 548 of Title 12 of the United States Code, or is for any reason finally adjudged invalid, or discriminatory under the California Constitution, or the laws or the Constitution of the United States, the tax of the favored taxpayer shall be recomputed by the [FTB] for the taxable year in question, as of the time of allowance of the deduction, credit, or exclusion, by disallowing the deduction, credit, or exclusion, and any difference between the amount of the tax as recomputed and the amount of the tax as originally computed shall be subject to the provisions hereof relating to original computations."

the year in question by disallowing the deduction. However, the section 19393 remedy could not be applied to taxpayers for taxable years ending prior to December 1, 1999, because some taxpayers had already taken the deduction and the time to mail notices of proposed assessments disallowing the section 24402 deduction for those years had passed;[7] thus it was not possible to treat all taxpayers comparably for those tax years by disallowing the section 24402 deduction. Conversely, at the time the FTB issued notices of proposed assessments pursuant to its March 4, 2004 communication on implementing the *Farmer Bros.* decision, the time for issuing new assessments *was open* for all taxpayers who took a dividends received deduction for tax years ending on or after December 1, 1999. Therefore, the section 19393 remedy kicked in to disallow the dividends received deduction for all taxpayers for those tax years. In sum, where possible, favored taxpayers were assessed additional tax, thereby achieving parity with taxpayers who experienced discrimination during the same period.

### 3. *Analysis*

 River Garden assaults the trial court decision and the FTB remedy on several fronts. First, it contends demurrer was improper because the FTB did not establish that it had cured the discrimination for the years in question, i.e., by showing that the favored and disfavored taxpayers in fact were treated equally during that period. River Garden offers no authority for this proposition. More significantly, saddling the FTB with this burden in a taxpayer refund suit under section 19382 would exponentially enlarge the action to encompass collateral trials on how, at any given point in time, implementation of a given remedy or program is progressing. The duty under *McKesson* is to provide a "clear and certain remedy" to rectify the discriminatory tax treatment. That the FTB has done. When, as in this case, the taxing authority chooses a remedial alternative that includes retroactive assessments, the *McKesson* court surmised that a "good-faith effort to administer and enforce such a [remedy] likely would constitute adequate relief . . . ." (*McKesson, supra,* 496 U.S. at pp. 40–41, fn. 23.) River Garden's suit for a refund of taxes attacks the validity of the remedy; its complaint does not allege that the FTB has failed to make a good faith effort to administer and enforce the remedy.

Second, River Garden insists that section 19393 applies only to national banks, River Garden is not a national bank, and thus the FTB lacked

---

[7] Subject to exceptions not pertinent here, section 19057, subdivision (a) mandates that "every notice of a proposed deficiency assessment shall be mailed to the taxpayer within four years after the return was filed. No deficiency shall be assessed or collected with respect to the year for which the return was filed unless the notice is mailed within the four-year period . . . ."

authority to recompute its tax by disallowing the deduction. Third, River Garden is adamant that denial of the deduction for the contested years violates the due process prohibition against excessively retroactive tax increases. Finally, the company attacks the FTB's very authority to impose a remedy. We address each challenge below.

### a. *Section 19393*

Section 19393 codifies a retroactive assessment remedy where certain deductions are adjudged discriminatory or invalid. Focusing on the first clause of the statute, River Garden asserts that section 19393 pertains only to national banks, not general corporate taxpayers, and thus affords no basis for the remedy promulgated by the FTB in response to the *Farmer Bros.* decision. The FTB counters that by its plain terms, *all* corporate franchise taxpayers are subject to the FTB's statutory power to recompute taxes whenever a statute providing for a specified deduction "is for any reason finally adjudged invalid, or discriminatory under the California Constitution, or the laws or the Constitution of the United States . . . ." (§ 19393.) This same dispute was posed in *Ceridian* with respect to the remedy the company was entitled to in the face of the court's invalidation of section 24410. However, the court declined to address the breadth of section 19393 because the parties *agreed* that retroactive tax collection was impossible. The four-year period to assess or collect a tax deficiency (§ 19057) had come and gone for the tax years in question, and thus the retroactive assessment which section 19393 calls for could not lawfully be collected. (*Ceridian, supra,* 85 Cal.App.4th at pp. 888–889 & fn. 9.)

We agree with the FTB that section 19393, by its plain and grammatical terms, encompasses any "favored taxpayer" who benefitted from a deduction imposed under division 2, part 11 of the Revenue and Taxation Code (the Corporation Tax Law; § 23001 et seq.) that is finally adjudged invalid or discriminatory. The use of the word "or" in the statute, following the reference to national banking associations, clearly signals that the statute applies to a broader range of taxpayers. The statute does initially spotlight national banking associations, by way of its particular reference to 12 United States Code section 548, which requires national banks with principal offices in a state to be treated the same way as a state bank with respect to any tax law enacted by that state's legislature. However, with the following phrase it is apparent that the Legislature did not intend to limit the provision's applicability to national banks.

Nonetheless, River Garden maintains that such a construction would render the clause relating to national banking associations mere surplusage. If the "or is for any reason" clause embraces all taxpayers, so the argument goes,

then the prior reference to national banking associations would be mere surplusage because national banks would be covered by the latter provision. We disagree. The focus and subject matter of section 19393 is the discredited deduction, credit or exclusion that affects a taxpayer's liability, not the taxpayer itself. A deduction, credit or exclusion may be invalid in the particular sense that its effect or operation is to discriminate against or in favor of national banks and thus it is contrary to 12 United States Code section 548. It may also be invalid under the California or federal Constitution, or other federal laws. We are of course guided by the statutory maxim that courts should ascribe meaning to every word of a statute if possible, and stay clear of a construction that renders any word surplusage. (*Reno v. Baird* (1998) 18 Cal.4th 640, 658 [76 Cal.Rptr.2d 499, 957 P.2d 1333].) However, while 12 United States Code section 548 certainly is a law "of the United States," there is no rule prohibiting the Legislature from emphasizing a particular point notwithstanding the rule against surplusage. (*Farmers Ins. Exchange v. Superior Court* (2006) 137 Cal.App.4th 842, 858 [40 Cal.Rptr.3d 653].) Nor is there a rule of statutory construction requiring courts "to assume that the Legislature has used the most economical means of expression in drafting a statute . . . ." (*Voters for Responsible Retirement v. Board of Supervisors* (1994) 8 Cal.4th 765, 772–773 [35 Cal.Rptr.2d 814, 884 P.2d 645].) Again, here the legislative drafters wished to emphasize the FTB's authority to recompute deductions, credits or exclusions that run afoul of 12 United States Code section 548, while also more broadly recognizing that authority when a taxing provision fails under the state or federal Constitution or other federal law.

 River Garden further contends that the legislative history of section 19393 confirms that the statute only pertains to national banks. When construing a statute to ascertain legislative intent, we must first look to the words of the statute themselves, giving the language its usual and ordinary meaning. (*State Farm Mutual Automobile Ins. Co. v. Garamendi* (2004) 32 Cal.4th 1029, 1043 [12 Cal.Rptr.3d 343, 88 P.3d 71].) If there is no ambiguity, we presume the Legislature meant what it said and the plain meaning of the language controls. We will not resort to legislative history or other sources where, as here, the statute is clear and unambiguous on its face. (*Lennane v. Franchise Tax Bd.* (1994) 9 Cal.4th 263, 268 [36 Cal.Rptr.2d 563, 885 P.2d 976]; *Pacific Gas & Electric Co. v. Public Utilities Com.* (2000) 85 Cal.App.4th 86, 91–92, 95–96 [102 Cal.Rptr.2d 20].)

 On a somewhat related note, River Garden also charges that article III, section 3.5 of the California Constitution proscribes the FTB, as an administrative agency, from determining how to implement our tax laws in the face of *Farmer Bros.* That provision states that an administrative agency has no power "[t]o declare a statute unenforceable, or refuse to enforce a statute, on the basis of it being unconstitutional unless an appellate court has

made a determination that such statute is unconstitutional." (Cal. Const., art. III, § 3.5, subd. (a).) The argument is that an appellate court has not passed on the remedial issues framed by this appeal and thus the FTB has no power "to choose its own remedy."

■ Here, of course, the courts in *Farmer Bros.* and *Abbott* have unequivocally established that section 24402 is unconstitutional. That is all that is required to enable the FTB, as the administrative agency in charge of administering California's income and franchise tax laws, to craft a remedy declining to enforce the statute—i.e., disallowing the deduction—for the years at stake in this appeal. There is no overstepping. Indeed, the very manner in which the FTB chose to remedy administration and enforcement of the tax laws so as to bring River Garden and its competitors into parity for purposes of the commerce clause is sanctioned by section 19393.

### b. *Due Process*

Notwithstanding section 19393, River Garden insists that the remedy of disallowing the dividends received deduction for tax years ending on or after December 1, 1999, violates the due process prohibition against excessively retroactive tax increases.

### 1. *Guiding Principles*

■ The retroactive imposition of a tax does not necessarily deny due process to those whose liabilities are increased. "In each case it is necessary to consider the nature of the tax and the circumstances in which it is laid before it can be said that its retroactive application is so harsh and oppressive as to transgress the constitutional limitation." (*Welch v. Henry* (1938) 305 U.S. 134, 147 [83 L.Ed. 87, 59 S.Ct. 121].) Stated a little differently, "legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations. [Citations.] This is true even though the effect of the legislation is to impose a new duty or liability based on past acts." (*Usery v. Turner Elkhorn Mining Co.* (1976) 428 U.S. 1, 16 [49 L.Ed.2d 752, 96 S.Ct. 2882].)

More recently, the high court has explained that the " 'harsh and oppressive' " concept articulated in *Welch v. Henry, supra,* 305 U.S. 134 " 'does not differ from the prohibition against arbitrary and irrational legislation' that applies generally to enactments in the sphere of economic policy. [Citation.] The due process standard to be applied to tax statutes with retroactive effect, therefore, is the same as that generally applicable to retroactive economic legislation: [¶] 'Provided that the retroactive application of a statute is supported by a legitimate legislative purpose furthered by rational means,

judgments about the wisdom of such legislation remain within the exclusive province of the legislative and executive branches . . . . [¶] . . . "The retroactive aspects of legislation . . . must meet the test of due process . . . ." But that burden is met simply by showing that the retroactive application of the legislation is itself justified by a rational legislative purpose.' [Citation.]" (*United States v. Carlton* (1994) 512 U.S. 26, 30–31 [129 L.Ed.2d 22, 114 S.Ct. 2018] (*Carlton*).)

In *Carlton, supra*, 512 U.S. 26, Congress amended the federal estate tax law to close a perceived loophole by limiting the availability of a deduction. The executor of the estate engaged in a tax-motivated transaction to take advantage of the loophole and claimed the deduction in question before Congress passed the ameliorative amendment. However, the amendment applied retroactively to enactment of the original statute, with an actual retroactive effect of slightly more than a year. Therefore the Internal Revenue Service disallowed the deduction; the taxpayer paid the deficiency plus interest, then sued.

Concluding that retroactive application of the amendment did not offend due process, the court first emphasized that Congress adopted the amendment as a curative measure, and its purpose was neither illegitimate nor arbitrary. Congress acted to rectify what it reasonably perceived as a mistake in the original tax law which, left unamended, would have resulted in a significant revenue loss while also allowing taxpayers to engage " 'in essentially sham transactions.' " (*Carlton, supra*, 512 U.S. at p. 32.) Further, the means of achieving this purpose was not unreasonable. Specifically, "Congress acted promptly and established only a modest period of retroactivity." (*Ibid.*)

Discarding the executor's claims of detrimental reliance and lack of notice as not dispositive, the court stated that reliance alone is not enough to show a constitutional violation. "Tax legislation is not a promise, and a taxpayer has no vested right in the Internal Revenue Code." (*Carlton, supra*, 512 U.S. at p. 33.) Nor was the court impressed with the notice argument, noting that it had rejected similar arguments in other cases. (*Id.* at p. 34.) The lower court held Congress to "an unduly strict standard" by "focusing exclusively on the taxpayer's notice and reliance" concerns. (*Id.* at p. 35.) Because the retroactive application of the amendment "is rationally related to a legitimate legislative purpose," the court concluded the amendment, as applied, was consistent with the due process clause. (*Carlton, supra*, at p. 35.)

Concurring in the judgment, Justice O'Connor expressed that "[t]he governmental interest in revising the tax laws must at some point give way to the taxpayer's interest in finality and repose. . . . [¶] . . . A period of retroactivity longer than the year preceding the legislative session in which the law was

enacted would raise, in my view, serious constitutional questions." (*Carlton, supra*, 512 U.S. at pp. 37–38 (conc. opn. of O'Connor, J.).)

2. *Post*-Carlton

■ Although the *context* in which retroactivity arises in this case differs from that of *Carlton*—imposition of an administrative remedy to cure the discriminatory impact of a statute as opposed to enactment of tax legislation to close a loophole—the retroactive application of the remedy or the legislation both touch on due process concerns. Our particular focus lies in determining whether the retroactive period here was sufficiently "modest" as to pass constitutional muster. Not surprisingly, post-*Carlton*, courts have not articulated an acid test for determining the acceptable time limits on retroactive tax assessments. Instead, inquiry and analysis frequently are heavily dependent on the facts and circumstances surrounding the legislation or administrative or judicial remedy.

For example, one federal court sustained a statute that retroactively barred refunds for taxes erroneously paid *up to six years* prior to the enactment. (*Montana Rail Link, Inc. v. U.S.* (9th Cir. 1996) 76 F.3d 991.) The court determined that the act in question served the legitimate purpose of protecting the retirement funds of railroad workers and the six-year period was rationally related to that underlying purpose. A shorter period of retroactivity would have been irrational and arbitrary in that it would have "severely hurt workers" who retired expecting a level of benefit based in part on erroneously paid employer contributions. (*Id.* at pp. 993–994.)

So, too, in *Enterprise Leasing v. Department of Revenue* (Ct.App. 2008) 221 Ariz. 123 [211 P.3d 1] (*Enterprise Leasing*), a state reviewing court upheld a tax code amendment with a six-year retroactive term which clarified that a previously granted tax credit for pollution control equipment did not apply to motor vehicles. The court reasoned that the legislation was curative, and even if it were not curative, it was supported by the legitimate purpose of fixing a perceived loophole to stem exposure to refund claims, and was furthered by a rational means. In addition, the taxpayer had no vested right to the tax credit. (*Id.*, 211 P.3d at pp. 4–5.) Moreover, the court rejected "a talismanic cutoff of one year," noting that the one-year concept arose from Justice O'Connor's concurrence in *Carlton* rather than the majority opinion. (*Enterprise Leasing, supra*, 211 P.3d at pp. 5–6.) "Some leeway for longer retroactivity exists so long as the legislature acts at the earliest notice or opportunity," which occurred in the case under review. (*Id.* at p. 6.)

And in *Monroe v. Valhalla Cemetery Co., Inc.* (Ala.Civ.App. 1999) 749 So.2d 470, overruled on other grounds in *Patterson v. Gladwin Corp.* (Ala.

2002) 835 So.2d 137, 153, an Alabama reviewing court approved a use tax statute with a retroactive span of two to three years that operated to prevent taxpayers from seeking certain use tax refunds. Closing a perceived loophole was a legitimate legislative end, and the period of retroactivity was modest; indeed, prior precedent had upheld a retroactivity period of eight years. (*Monroe v. Valhalla Cemetery Co., Inc., supra*, at pp. 474–475.)

Legislation has also been sustained, over due process concerns, which retroactively cured a statute found to violate the commerce clause by exposing taxpayers to multiple taxation. (*Moran Towing Corp. v. Urbach* (N.Y.App.Div. 2003) 1 A.D.3d 722 [768 N.Y.S.2d 33] (*Moran Towing*) [1997 tax amendments applied retroactively to 1990].) Observing that where legislation is curative, retroactivity may be construed liberally and afforded heightened flexibility, particularly when the amendment responds to a federal constitutional infraction, the court harked to *McKesson*, declaring that the state could retain the tax appropriately levied under the reformulated scheme because the taxpayer's deprivation of property would be pursuant to a scheme that honored the commerce clause. (*Moran Towing, supra*, at pp. 724–725.)

Recently the Kentucky Supreme Court determined that amendments to the commonwealth's tax code, which retroactively eliminated taxpayers' pending administrative claims for overpayment of income tax, did not violate the taxpayers' due process rights. (*Miller v. Johnson Controls, Inc.* (Ky. 2009) 296 S.W.3d 392, cert. den. *sub nom. Johnson Controls, Inc. v. Miller* (2010) ___ U.S. ___ [176 L.Ed.2d 1240, 130 S.Ct. 3324].) The period of retroactivity was more than five years. Rejecting a one-year modesty requirement, the court reasoned that what is appropriately modest requires analysis of the circumstances and facts of each case, the pertinent question being whether the retroactivity period "is one that makes sense in supporting the legitimate governmental purpose . . . ." (*Miller v. Johnson Controls, Inc.*, at p. 399.) The legislature acted to correct a perceived mistake of law, with the legitimate purpose of raising and controlling revenue, and the statute rationally furthered that purpose. (*Id.* at p. 400.) Additionally, the taxpayers were on notice of the revenue intent and could not have had settled expectations to the contrary. Moreover, the legislature acted at the first reasonable opportunity. (*Id.* at p. 401.)

Other courts have denied or dismissed the possibility of retroactive assessments. In *City of Modesto v. National Med, Inc.* (2005) 128 Cal.App.4th 518 [27 Cal.Rptr.3d 215] (*Modesto*), the city attempted to retroactively impose revenue apportionment guidelines in an effort to moot pending refund claims. The reviewing court held that it would not be appropriate to reform the tax ordinance in this way. The city did not act promptly, and the period of

retroactivity—up to eight years—was not modest. Further, retroactive application of the apportionment provisions would require the complaining taxpayer to produce documentation for up to nine years that it otherwise was not required to maintain. Citing Justice O'Connor's constitutional concerns where the period of retroactivity extends beyond the year preceding the session in which the law was passed, the court also observed that generally California courts have upheld retroactive application of tax laws only where the retroactivity was limited to the current tax year. (*Id.* at pp. 528–529; see *Carlton, supra*, 512 U.S. at p. 38 (conc. opn. of O'Connor, J.).)

Also seizing on Justice O'Connor's concerns, a South Carolina court concluded that a statute which retroactively decreased taxpayers' capital gains for a period of two to three years violated due process under the state and federal Constitutions, deeming the retroactivity period excessive. (*Rivers v. State* (1997) 327 S.C. 271 [490 S.E.2d 261, 264–265].) In similar summary fashion, an Arizona court rejected retroactive assessments as a remedy to cure a state constitutional violation of uniformity principles, concluding the remedy was " 'harsh and oppressive,' raised significant due process concerns, . . . was not requested by the taxpayer," and moreover the county had not indicated it would be willing to go that route. (*Scottsdale Princess v. Department of Revenue* (Ct.App. 1997) 191 Ariz. 499 [958 P.2d 15, 21].)

### 3. *No Due Process Violation*

River Garden relies on *Modesto, supra*, 128 Cal.App.4th 518, to press that the FTB's retroactive assessment for the years at issue violates due process. We reject this general premise, based on a number of considerations.

The opinions surveyed above have assumed a variety of stances on whether *Carlton* separately requires a modest period of retroactivity, or merely requires a legitimate purpose furthered by rational means, irrespective of modesty concerns. For example, the court in *Montana Rail* held that a shorter period of retroactivity would have been arbitrary, and did not specifically address the modesty issue. (*Montana Rail Link, Inc. v. U.S., supra*, 76 F.3d at pp. 993–994.) *Enterprise Leasing* advocated leeway for retroactivity beyond one year when the legislature acts promptly. (*Enterprise Leasing, supra*, 211 P.3d at p. 6.) An Alabama court found a two-to-three-year period modest, noting prior precedent upholding an eight-year period of retroactivity. (*Monroe v. Valhalla Cemetery Co., Inc., supra*, 749 So.2d at pp. 474–475.) The court in *Moran Towing* emphasized the need for flexibility when retroactive tax legislation is implemented in response to a federal constitutional infraction, and did not mention *Carlton*. (*Moran Towing, supra*, 1 A.D.3d at pp. 724–725.) And in *Miller*, the Kentucky high court rejected a one-year modesty requirement, stressing that what is modest depends on the

circumstances and facts of the case. (*Miller v. Johnson Controls, Inc., supra*, 296 S.W.3d at pp. 399–400.) On the other hand, the *Modesto* court clearly embraced a distinct modesty requirement, pronounced that eight years was not modest, and generally sanctioned Justice O'Connor's one-year approach. (*Modesto, supra*, 128 Cal.App.4th at pp. 528–529.) So, too, the *Rivers* court sided with Justice O'Connor's concerns, deeming a two-to-three-year period of retroactivity excessive. (*Rivers v. State, supra*, 490 S.E.2d at pp. 264–265.)

We agree with *Modesto* that *Carlton* does call for a modest period of retroactivity, but we do not subscribe to the view that a period longer than one year in and of itself raises serious constitutional questions.[8] Rather, we believe that the modesty of the period must be assessed under the facts and circumstances of the case.

■ We begin by recognizing that the FTB's remedy of retroactively assessing the favored class of taxpayers complied with *McKesson*'s directive to provide meaningful backward-looking relief where the constitutional violation is one of unequal treatment. The legitimate nature and purpose of the remedy—to cure the commerce clause inequities stemming from allowance of the section 24402 deductions—is obvious and deserves favorable consideration. (See *Moran Towing, supra*, 1 A.D.3d at pp. 724–725; *Enterprise Leasing, supra*, 211 P.3d at p. 4.) Over and over, *McKesson* emphasizes that states retain flexibility to fashion an appropriate remedy consistent with minimum due process requirements. (*McKesson, supra*, 496 U.S. at pp. 39–40, 51–52.)

■ We also give due consideration to the fact that the FTB developed the remedy pursuant to its delegated authority under section 19393. The current statute was enacted in 1993. Therefore, the taxpaying electorate has been on notice for a number of years that the Legislature delegated to the FTB the responsibility to recompute "any deduction, credit or exclusion" that is finally adjudged discriminatory under the federal Constitution. With this state of affairs it is difficult to argue that a taxpayer would have settled expectations in a remedy allowing only for refunds of unconstitutional deductions but not for retroactive assessments to level the favoritism meted out under the unconstitutional scheme. We note too that the *possibility* of applying section 19393 in a similar context was broached but not decided in *Ceridian* in 2000. In any event, we are talking about disallowing tax

---

[8] We are mindful that *Modesto* makes general mention that California courts uphold retroactive application of tax statutes on a limited basis, i.e., limited to the current tax year. (*Modesto, supra*, 128 Cal.App.4th at p. 529, citing *Gutknecht v. City of Sausalito* (1974) 43 Cal.App.3d 269, 282 [117 Cal.Rptr. 782].) *Gutknecht*, and the cases it cites, did not arise in a curative context; rather, the cases all refer to the general principle that taxes levied for revenue purposes may be changed at any time during the current tax year. (See, e.g., *Fullerton Oil Co. v. Johnson* (1934) 2 Cal.2d 162, 176 [39 P.2d 796].)

*deductions* for a certain period. Deductions are a matter of legislative grace. (*Krumpotich v. Franchise Tax Bd.* (1994) 26 Cal.App.4th 1667, 1671 [31 Cal.Rptr.2d 896].) Taxpayers have no vested right in the Internal Revenue Code nor, by analogy, to the California Revenue and Taxation Code and its dividends received deduction. (*Carlton, supra,* 512 U.S. at p. 33; *Enterprise Leasing, supra,* 211 P.3d at p. 5.)

In addition, here the period of retroactivity coincides squarely with the four-year statute of limitations for issuing a deficiency assessment, adding reasonableness to the remedy. As well, the FTB acted quickly to develop the policy and procedures outlining how to apply the ruling of *Farmer Bros.* to other taxpayers.

We also point out that, unlike the situation in *Modesto* which would have required the taxpayer to produce nine years of documentation, here the FTB's scheme did not place new obligations on the taxpayer undermining the clarity or certainty of the remedy in a manner inconsistent with due process. (See *Ventas Finance I, LLC v. Franchise Tax Bd., supra,* 165 Cal.App.4th at pp. 1232–1233.)

For all these reasons we conclude the four-year period of retroactivity embedded in the FTB's remedy is modest. With this timeframe the FTB has crafted a clear and certain remedy affording meaningful backward-looking relief, a remedy treating all taxpayers on parity for the years in question.

### c. *No Violation of Article XIII A, Section 3*

California Constitution article XIII A, section 3 states: "[A]ny changes in state taxes enacted for the purpose of increasing revenues collected pursuant thereto whether by increased rates or changes in methods of computation must be imposed by an Act passed by not less than two-thirds of all members elected to each of the two houses of the Legislature . . . ." River Garden protests that the FTB's decision to issue deficiency assessments to recoup the dividends received deductions for the years in question results in a tax increase for corporate taxpayers not approved by a two-thirds vote of the Legislature, in breach of the above constitutional mandate. Not so.

California Constitution article XIII A—the voter initiative commonly referred to as Proposition 13—imposes "important limitations upon the *assessment and taxing powers* of state and local governments." (*Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208, 218 [149 Cal.Rptr. 239, 583 P.2d 1281], italics added.) Section 3 of this article by its terms and according to the overall aim of the initiative applies only to revenue increasing enactments. The FTB is charged with

administering and enforcing our franchise and income tax laws. It *does not* have taxing powers. The FTB's disallowance of the dividends received deduction was a policy directive undertaken under the authority of section 19393 and federal and state case law. It did not "enact" anything within the meaning of article XIII A, section 3. Moreover, the purpose of the policy directive was to rectify the commerce clause iniquities inherent in section 24402. It was not developed or implemented "for the purpose of increasing revenues collected."

## B. *Amnesty Penalty*

### 1. *Background*

The 2005 California tax amnesty program administered by the FTB granted taxpayers with unpaid or underpaid tax liabilities for tax years beginning before January 1, 2003, a window of opportunity—from February 1, 2005, through March 31, 2005—to apply for amnesty, thereafter pay delinquent California income and franchise taxes, and escape unpaid penalties, fees and criminal sanctions.[9] (§ 19730 et seq.) This amnesty program contained " 'carrot' " and " 'stick' " provisions that encouraged delinquent taxpayers to participate and punished those who did not.[10] The carrot of course was the opportunity to come forward and pay past delinquencies, including interest, without a penalty or the possibility of criminal prosecution. (§§ 19731–19733.) The stick was the increased penalties and interest that would befall taxpayers eligible to participate in the amnesty who chose not to do so. (§ 19777.5.)

To participate, a taxpayer had to file an amnesty application and, among other things, within 60 days of the end of the amnesty period (1) for each eligible taxable year for which amnesty was requested, pay in full the taxes and interest due or apply for an installment payment agreement;[11] and (2) where the taxpayer had not paid in full any taxes previously *proposed to be assessed*, pay in full the taxes and interest due for that portion of the proposed assessment for each eligible taxable year for which amnesty was requested, or apply for an installment payment agreement. (§ 19733,

---

[9] A similar program administered by the State Board of Equalization was enacted at the same time with respect to delinquent sales and use taxes. (§ 7070 et seq.)

[10] The Assembly Committee on Appropriations used these terms in its April 28, 2004 bill analysis to describe the amnesty program, as did the Assembly Revenue and Taxation Committee in its April 19, 2004 committee statement. (Assem. Com. on Appropriations, Analysis of Assem. Bill No. 2203 (2003–2004 Reg. Sess.) as amended Apr. 13, 2004, p. 4; Assem. Com. on Revenue and Taxation, Com. Statement on Assem. Bill No. 2203 (2003–2004 Reg. Sess.) Apr. 19, 2004, p. 1.)

[11] Under the installment plan, final payment was due by June 30, 2006. (§ 19733, subd. (b)(1).)

subd. (a)(2), (3)(B).) As well, the participating taxpayer had to give up any right to claim a refund or credit for any amount paid in connection with the program. (§ 19732, subd. (e).)

The increased penalties set forth in section 19777.5 for those eligible to participate who failed to do so were serious: "(a) There shall be added to the tax for each taxable year for which amnesty could have been requested: [¶] (1) For amounts that are due and payable on the last day of the amnesty period, an amount equal to 50 percent of the accrued interest payable under Section 19101 for the period beginning on the last date prescribed by law for the payment of that tax (determined without regard to extensions) and ending on the last day of the amnesty period specified in Section 19731. [¶] (2) For amounts that become due and payable after the last date of the amnesty period, an amount equal to 50 percent of the interest computed under Section 19101 on any final amount, including final deficiencies and self-assessed amounts, for the period beginning on the last date prescribed by law for the payment of the tax for the year of the deficiency (determined without regard to extensions) and ending on the last day of the amnesty period specified in Section 19731." (§ 19777.5, subd. (a)(1), (2).)

The amnesty penalty thus applied to two groups of taxpayers: those for whom a tax liability for an amnesty-eligible tax year existed *during* the amnesty period (§ 19777.5, subd. (a)(1)), and those for whom a final tax deficiency for an amnesty-eligible tax year arose *after* the end of the amnesty period, whether the deficiency was self-assessed or identified by the FTB (*id.*, subd. (a)(2)). This latter category applied to deficiency assessments that did not become final assessments until after the close of the amnesty period and thus were due and payable later.

Among other possible scenarios, the section 19777.5, subdivision (a)(2) situation would come into play when, as here, the taxpayer pursues administrative review of a tax deficiency proposed by the FTB and the deficiency is not determined with finality by March 31, 2005. The administrative ladder begins with a written "protest" to a proposed tax assessment; once filed, the FTB reconsiders the proposed deficiency and, after a hearing (if requested), mails notice of action to the taxpayer. (§§ 19041, 19044, 19045.) That notice becomes final after 30 days from the date of mailing unless the taxpayer appeals to the State Board of Equalization. (§ 19045, subd. (a).) The board notifies the party and the FTB of its determination, which in turn becomes final after 30 days from issuance unless the taxpayer petitions for rehearing, in which case the determination is final 30 days from the date the board issues its opinion on the petition. (§§ 19047, 19048.) When, at any point in this process, the deficiency is determined and the assessment becomes final, the FTB mails notice and a demand to the taxpayer for payment thereof.

(§ 19049, subd. (a).) Thus, the date that an assessment becomes final hinges on the extent to which the taxpayer pursues administrative review.

Taxpayers such as River Garden whose reporting position on returns for open amnesty years was under administrative review during the amnesty window had three choices: (1) pay the proposed assessments plus interest and any penalties in full *prior to* the end of the amnesty period; with this approach the taxpayer would avoid new amnesty penalties and preserve the ability to proceed administratively and judicially with respect to all outstanding amounts, instead of waiving refund and credit rights; (2) apply for amnesty, pay all proposed assessments and interest, enjoy the waiver of penalties and waive refund and credit rights; (3) do not pay the proposed assessments, do not apply and participate in the amnesty program, and take one's chances on the outcome of administrative and/or judicial review.

It is undisputed that, notwithstanding that in April 2004 River Garden received notices of proposed assessments for 1999 and 2000, and was aware of the amnesty program and the two-month window, the company chose not to participate and did not pay any of the assessments until May 9, 2007.

### 2. The Deficiency Assessments Were "Due and Payable"

River Garden now charges that the trial court erred in entering summary judgment on its challenge to the section 19777.5 tax amnesty penalty for the two years at issue. Its opening argument is this: River Garden is not subject to an amnesty penalty because it fully paid the tax deficiencies on which the penalty was levied *before* they ever became "due and payable" within the meaning of section 19777.5, subdivision (a). River Garden proposes that the "due and payable" language should be construed in connection with section 19049, subdivision (a), referenced above, and stating: "When a deficiency is determined and the assessment becomes final, the [FTB] shall mail notice and demand to the taxpayer for the payment thereof. The deficiency assessed is due and payable at the expiration of 15 days from the date of the notice and demand." Continuing in this vein, River Garden reasons that its payment of the tax deficiency on May 9, 2007, occurred within 15 days of the FTB's April 27, 2007 corporation formal demand, and thus never became "due and payable" for purposes of imposing the amnesty penalty. This argument is flawed for a number of reasons.

First, although section 19777.5 does not define "due and payable," it does specifically state that "[a]rticle 3 (commencing with Section 19031), (relating to deficiency assessments) *shall not apply* with respect to the assessment or collection of any penalty imposed by subdivision (a)." (§ 19777.5, subd. (d), italics added.) Division 2, part 10.2, chapter 4, article 3

of the Revenue and Taxation Code (entitled "Deficiency Assessments") comprises sections 19031 through 19067, and of course encompasses section 19049. Certainly the process of assessing and collecting an amnesty penalty would embrace and take into account the notice and demand provisions of section 19049 defining when a deficiency is due and payable, *if* that statute applied. Since the Legislature has decreed that it does not, the statute does not aid River Garden's theory.

Moreover, it makes sense that the Legislature excised division 2, part 10.2, chapter 4, article 3 of the Revenue and Taxation Code from the amnesty penalty provisions. The taxpayer who takes advantage of amnesty relinquishes the right to claim a refund or credit for amounts paid in connection with the program. (§ 19732, subd. (d).) This being so, the taxpayer in effect gives up article 3 rights to protest a deficiency assessment paid through the amnesty program, appeal to the State Board of Equalization, and the like. Manifestly the section 19777.5, subdivision (a)(2) penalty would be meaningless if an eligible taxpayer who chose *not* to participate in the amnesty program, nonetheless could rely on article 3 rights and provisions to dodge the very penalty that is aimed at that taxpayer. Section 19777.5, subdivision (d) obviates this anomaly.

 The FTB takes the position that the section 19777.5, subdivision (a)(2) amnesty penalty may be imposed once the underlying tax deficiency on which the penalty rests has been determined with finality. By its terms subdivision (a)(2) only applies to "final amount[s], including final deficiencies" that become due and payable after the close of the amnesty period. (§ 19777.5, subd. (a)(2).) As noted above, *when* a deficiency assessment becomes final may well depend on how far up the administrative review ladder the taxpayer takes its protest. In this case, the assessment became final when the State Board of Equalization's determination became final 30 days after it issued its September 12, 2006 decision affirming the FTB's notices of action. Once the deficiency assessment achieved finality, it thus "became due and payable" after the close of the amnesty period within the sense of the statute, and the FTB properly issued a notice of balance due to River Garden which included the amnesty penalty.

This reading of the statute comports with the legislative intent. To begin with, the amnesty program and related legislation was enacted as urgency legislation "[i]n order to alleviate the current fiscal crisis . . . ." (Stats. 2004, ch. 226, § 14.) Further, the Legislature specifically stated its intent that the FTB make the amnesty application process "as streamlined as possible to ensure participation in the amnesty program will be available to as many taxpayers as possible . . . ." (§ 19733, subd. (c)(2).) As well, the FTB was charged with conducting a public outreach program and adequately publicizing the amnesty program "so as to maximize public awareness and to make

taxpayers aware of the program," including the penalties associated with the failure to participate. (§ 19736, subd. (a).) The program required taxpayers to pay in full within a short period of time, or initiate an installment program with the final payment due no later than June 30, 2006. (§ 19733, subd. (b).) Additionally, the Senate Budget and Fiscal Review Committee, in its Senate floor analyses of July 29, 2004,[12] indicated that the state's last amnesty program (10 years prior) had increased the FTB's ability to target nonreporting and underreporting of tax liabilities. Revenue estimates for the proposed program included $260 million net from recouped income and corporate taxes.

From this it is apparent that the tax amnesty program aimed to accelerate the collection of unreported and underreported tax liabilities, bringing taxpayers into the tax system through outreach and streamlined efforts, all to the end of achieving fiscal benefits. River Garden's interpretation of the amnesty legislation would allow a nonparticipating, noncompliant taxpayer to escape the amnesty penalty by paying its tax liability following a final assessment issued years after the close of the amnesty period, but within 15 days of a notice and demand for payment. Surely this result does not comport with the legislative intent. To the contrary, the intent is to afford taxpayers the chance to avoid the harsher amnesty penalties that would come into play if amnesty could have been requested but was not, while reaping the benefit of forgiven penalties and avoiding possible criminal action by participating in the program.

### 3. *River Garden's Counterarguments Are Not Persuasive*

Citing the canon of statutory construction that every word and phrase has significance and was chosen for a purpose, River Garden first counters that the Legislature's choice of the words "due and payable" rather than "final assessment" in section 19777.5, subdivision (a)(2) must be accorded significance apart from the terms "final amounts" and "final deficiencies" (which in effect mean the same thing as a "final assessment"). Therefore, the FTB's reading of the statute which seeks to equate "due and payable" with final assessment must fail. It is not a matter of equating "due and payable" with "final assessment"—that is, the terms are not synonymous. Rather, where, as in the case before this court, the focus is on a deficiency from an amnesty-eligible taxable year that is determined with finality through the administrative process *after* the close of the amnesty period, the amount becomes due and payable for purposes of imposing an amnesty penalty upon

---

[12] As found on pages 4, 6 and 7 of the Senate Rules Committee, Office of Senate Floor Analyses, Unfinished Business Analysis of Senate Bill No. 1100 (2003–2004 Reg. Sess.) as amended July 28, 2004.

such final determination. It could not be otherwise.[13] Until there is a final determination, there is nothing fixed to which the amnesty penalty can attach.

■ Next, River Garden says that the FTB's interpretation leads to absurd consequences because taxpayers with "no known liabilities" as of the end of the amnesty period, as well as taxpayers who are contesting proposed tax liabilities at the end of that period, might be subject to a penalty if the FTB later determines there is a tax deficiency. In both cases, it asserts, the taxpayer is penalized for failing to make a payment for an unknown tax liability or forced to make a protective payment. First, the case of a taxpayer with no known liability is not before us and we express no opinion about that situation. But we do point out that the legislation requires the FTB to "make reasonable efforts to identify taxpayer liabilities and, to the extent practicable," "send written notice to taxpayers of their eligibility for the tax amnesty program."[14] (§ 19736, subd. (b).) We are dealing with a taxpayer with notice of proposed assessments that it chose to appeal through the administrative process. It could have paid the proposed assessment prior to March 31, 2005, and pursued its administrative remedy without fear of accruing section 19777.5 penalties. It did not, and now complains that it has to pay the known consequences. This is not an absurdity.

Similarly, River Garden urges that a penalty aimed at "coercing" taxpayers to pay liabilities before they are finally determined is contrary to a long-standing policy affording taxpayers an opportunity to challenge disputed assessments before paying. River Garden seems to forget that this is an *amnesty* program—there are benefits to participating and adverse consequences for not participating, which means the taxpayer can undertake a cost-benefit analysis to determine if coming in under amnesty is worth it. Additionally, the amnesty program does not effect a permanent change in the way the tax system works. Rather, the provisions take precedent for taxable years beginning *prior to* January 1, 2003.

---

[13] River Garden reminds us that uncertainty in a statute imposing penalties should be strictly construed in favor of the taxpayer, citing *Waterman Convalescent Hospital, Inc. v. Jurupa Community Services Dist.* (1996) 53 Cal.App.4th 1550, 1554 [62 Cal.Rptr.2d 264]. This rule of course applies to resolve a true ambiguity, that is, when a statute is capable of two reasonable constructions. (See *Hughes v. Board of Architectural Examiners* (1998) 17 Cal.4th 763, 776 [72 Cal.Rptr.2d 624, 952 P.2d 641].) As we have explained above, River Garden's proposed interpretation is not reasonable in light of the statute as a whole, which expressly rejects resort to section 19049 and the interpretation favored by River Garden.

[14] On the other hand, the failure of the FTB to notify an eligible taxpayer of the existence or correct amount of a tax liability does not preclude that taxpayer from participating in the program or constitute grounds for abating the penalty. (§ 19736, subd. (b).)

#### 4. *River Garden's Theory Is Factually Unsupportable*

Granting summary judgment in the FTB's favor, the trial court appropriately ruled that regardless of the correctness of River Garden's interpretation of "due and payable," it failed to pay within 15 days of notice and demand, pursuant to section 19049, subdivision (a). Therefore, the amnesty penalty attached.

River Garden has insisted that only the corporation formal demand notices, constituting the *third* set of demands sent by the FTB, constituted a proper section 19049 notice because it contained both a notice of tax due and a "demand" for payment of such taxes. We are not persuaded.

The first demand, entitled "Notice of Balance Due," set forth both the balance of taxes due as well as a payment due date. That notice, dated January 18, 2007, clearly delineated a payment due date of February 2, 2007—15 days from the date of notice. As well, it directed the taxpayer to pay by the payment due date under the threat of interest and/or penalties and the possibility of recording a notice of state tax lien after 30 days. The second demand—a corporation past due notice dated March 23, 2007—likewise identified the balance due, listed the final date for payment as April 7, 2007 (15 days later), and admonished the taxpayer that it must pay the full amount by that date to avoid additional interest and penalties, and that a tax lien might follow after 30 days. The last demand, the corporation formal demand of April 27, 2007, similarly set forth the balance due, identified the final date for payment as May 12, 2007, and repeated the admonishments of the prior notice.

River Garden's payment of the full assessment amounts on May 9, 2007, was well outside the requisite 15 days from the date of the first notice of balance due which, as we explain, fit the bill of a statutory notice and demand. A "demand" for our purposes is either "an act of demanding or asking esp. with authority"; or "something claimed as due." (Merriam-Webster's Collegiate Dict. (10th ed. 2001) p. 306.) The first notice qualified as a statutory notice and demand; it gave notice that the FTB claimed a specified amount as due and authoritatively directed the company to pay the amount claimed by the due date, under the threat of adverse consequences. This is all that section 19049 requires.

#### 5. *The Amnesty Penalty Does Not Operate Retroactively*

Next, River Garden tries to convince this court that section 19777.5 violates substantive due process because it operates impermissibly "for an [i]ndefinite and [e]xcessive [p]eriod of [r]etroactivity." Not so. In deciding

whether a statute applies prospectively or retroactively, we look to the function of the statute, not the form. We consider how the law affects a party's rights and liabilities. In particular, we ask if the law changes the legal consequences of past conduct by imposing different or new liabilities based on that past conduct. (*Californians for Disability Rights v. Mervyn's, LLC* (2006) 39 Cal.4th 223, 230–231 [46 Cal.Rptr.3d 57, 138 P.3d 207].) In other words, does the law substantially affect existing rights and obligations? (*Id.* at p. 231.)

 Section 19777.5 does not apply retroactively. The amnesty penalty does not operate to increase a taxpayer's liability for past conduct. Instead, it functions as an incentive for future conduct: apply for amnesty, or pay everything before the close of the amnesty period, and avoid the amnesty penalty. It is not past conduct that subjects a taxpayer to the amnesty penalty—not the past transactions or conduct that created the underpayments or deficiencies—but rather the *current failure* to discharge those liabilities according to the rules of the amnesty legislation. Simply put, it was River Garden's decision, after the enactment of section 19777.5, not to pay the deficiencies before March 31, 2005, or apply for amnesty. Section 19777.5 applies *prospectively* to assessments for amnesty-eligible tax years that remained unpaid or became final after the close of the amnesty period. The December 10, 2004 notices of action on the proposed assessment fully informed River Garden of the possibility that the FTB would impose substantial new penalties after expiration of the amnesty period if the company failed to take part in the program. The statute thus increased the consequences of not paying the proper amount for the years at issue within the dictates of the amnesty program, but did not change River Garden's underlying tax liability.

6. *There Is No Statute of Limitations Bar to Imposing the Amnesty Penalty for the 1999 Tax Year*

 Finally, River Garden declares that the statute of limitation for assessing the 1999 penalty had already expired by the time the Legislature enacted section 19777.5. This argument starts with section 19036, providing that notwithstanding any provision to the contrary, a tax penalty imposed under division 2, part 10.2 of the Revenue and Taxation Code[15] "may be assessed and collected in the same manner as if it were a deficiency." Therefore, River Garden reasons, just like tax deficiencies, penalties are subject to the standard statute of limitations. This means the FTB had four years from the time River Garden filed its 1999 tax return to assess the amnesty penalty. (§ 19057, subd. (a).) Since the company filed its 1999 tax

---

[15] The amnesty statutes (§§ 19730 et seq., 19777.5) come within division 2, part 10.2 of the Revenue and Taxation Code.

return in March 2000, the limitations period closed in March 2004, prior to the effective date of the amnesty legislation. (Stats. 2004, ch. 226, § 12.)

River Garden overlooks the crucial word "may" in section 19036. It is obvious that the Legislature decreed the amnesty penalty to be a creature of a different nature, one that *would not be* "assessed and collected in the same manner as if it were a deficiency." (*Ibid.*) Section 19036 comes within article 3 of division 2, part 10.2, chapter 4 of the Revenue and Taxation Code pertaining to deficiency assessments, which the Legislature has defined as off limits "with respect to the assessment or collection" of any amnesty penalty. (§ 19777.5, subd. (d).)

## III. DISPOSITION

We affirm the judgment (1) dismissing River Garden's cause of action for a refund of taxes based on the section 24402 dividends received deduction, following the sustaining of the FTB's demurrer without leave to amend; and (2) granting summary judgment in favor of the FTB on River Garden's cause of action for refund of the amnesty penalties.

Ruvolo, P. J., and Rivera, J., concurred.

Appellant's petition for review by the Supreme Court was denied November 10, 2010, S185795.