[No. B160061. Second Dist., Div. One. May 21, 2003.]

FARMER BROS. CO., Plaintiff and Respondent, v.
FRANCHISE TAX BOARD, Defendant and Appellant.

## COUNSEL

Bill Lockyer, Attorney General, W. Dean Freeman and Gregory S. Price, Deputy Attorneys General, for Defendant and Appellant.

Anglin, Flewelling, Rasmussen, Campbell & Trytten, Robin C. Campbell; Morrison & Foerster, Thomas Hugh Steele and Amy L. Silverstein for Plaintiff and Respondent.

## OPINION

**MALLANO, J.**—In this case of first impression, we hold that California Revenue and Taxation Code section 24402 (section 24402), known as the "dividends received deduction," violates the commerce clause of the United States Constitution (commerce clause) by discriminating against corporations engaged in interstate commerce.[1] Section 24402 affords to a corporate taxpayer an income tax deduction for a portion of the dividends it receives from another corporation when the dividends are declared. from income which was included in the payer corporation's measure of California franchise tax, alternative minimum tax, or corporation income tax.[2] In holding that section 24402 violates the commerce clause, we follow *Ceridian Corp.*

---

[1] The commerce clause provides that "Congress shall have Power . . . [¶] . . . [¶] . . . To regulate Commerce with foreign Nations, and among the several States, and with the Indian tribes." (U.S. Const., art. I, § 8, cl. 3.)

[2] Before 2000, former section 24402 provided a deduction in computing taxable income for "[a] portion of the dividends received during the income year declared from income which has been included in the measure of the taxes imposed under Chapter 2 . . . [corporation franchise tax], Chapter 2.5 . . . [alternative minimum tax], or Chapter 3 . . . [corporation income tax] upon the taxpayer declaring the dividends." (Former § 24402, subd. (a).)

In 2000, the Legislature amended subdivision (a) of section 24402 by replacing the phrase "income year" with "taxable year." For calendar and fiscal years beginning after January 1, 2000, "income year" and "taxable year" have the same meaning. (See Historical and Statutory Notes, 62 West's Ann. Rev. & Tax. Code (2003 supp.) foll. § 24402, p. 241.)

Subdivision (b) of section 24402 limits the deduction described in subdivision (a) in the following manner: (1) if the taxpayer owns more than 50 percent of the stock of the

*v. Franchise Tax Bd.* (2000) 85 Cal.App.4th 875 [102 Cal.Rptr.2d 611] (*Ceridian*), in which the First District held that Revenue and Taxation Code section 24410, which governs taxation of insurance company dividends paid to major corporate stockholders, was unconstitutional under the commerce clause.

The Franchise Tax Board (FTB) appeals from a judgment awarding plaintiff Farmer Bros. Co. (Taxpayer) state tax refunds totaling $811,000 for the tax years 1992 through 1998, plus interest and costs, as a remedy for overpaying taxes under the provisions of section 24402, which the trial court determined to be unconstitutional under the commerce clause. We agree with the trial court's conclusion and affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

This case was submitted for determination by the trial court on a joint stipulation of facts and written trial briefs, which provide the undisputed factual background.

Taxpayer is a California corporation primarily engaged in the business of manufacturing and selling coffee and coffee-related products. For the years 1992 through 1998, Taxpayer timely filed California corporate income or franchise tax returns with the FTB. Each return reported a "dividends received deduction" under section 24402, representing a portion of the dividends Taxpayer had received during the income year. Taxpayer owned less than 20 percent of the stock in each of the payer corporations which had issued dividends to Taxpayer during the years at issue. Thus, for those dividends which qualify for the deduction under the terms of section 24402, subdivision (a), the statute affords Taxpayer a maximum deduction of 70 percent of the amount of the dividend. (§ 24402, subd. (b); see fn. 2, *ante*.)

FTB had promulgated a schedule listing the corporations and the percentage of their dividends that were deductible under section 24402. The schedule was based on a formula which allowed for a sliding scale deduction so that the taxpayer was entitled to a greater deduction the more the income of the payer corporation was subject to specified California corporate taxes. (See Cal. Code Regs., tit. 18, § 24402 (rule 24402).)

---

dividend-paying corporation, the taxpayer may deduct 100 percent of the dividends; (2) if the taxpayer owns 20 percent or more of the stock of the dividend-paying corporation, the taxpayer may deduct 80 percent of the dividends; (3) if the taxpayer owns less than 20 percent of the stock of the taxpaying corporation, the taxpayer may deduct 70 percent of the dividends. (§ 24402, subds. (b)(1)-(3) & (c).)

Even though this case involves a former version or versions of section 24402 in effect from 1992 to 1998, we refer to former section 24402 as section 24402, for ease of reference.

As explained in rule 24402, "Taxpayers are permitted a deduction under Section 24402, for dividends received which were declared from income included in the measure of tax of the declaring corporation under this part." Rule 24402 also provides three examples to illustrate the operation of the dividends received deduction. Example (1) states: "The A Corporation receives dividends from B Corporation, whose entire income is also subject to tax under this part and has no other earnings not taxable under this part. A is allowed a deduction for all such dividends received from B." (Rule 24402.) Example (2) states: "The A Corporation received dividends from B Corporation, which is not subject to tax in California. None of the dividends received from B are deductible." (*Ibid.*) Example (3) states: "The A Corporation receives dividends from B Corporation, whose income is subject to allocation because its activities are carried on within and without the State. B's allocation percentage is 50 percent. The percentage of the dividends received by A which are deductible is determined by formula. The variance from 50 percent will be affected by the extent of nonunitary and nontaxable income." (*Ibid.*)

The concept of a "unitary business" has been developed in cases addressing the problem of the local taxation of businesses operating in more than one jurisdiction. (See *Container Corp. v. Franchise Tax Bd.* (1983) 463 U.S. 159, 164-166 [103 S.Ct. 2933, 2939-2941, 77 L.Ed.2d 545].) "California, like many other States, uses what is called a 'unitary business' income-calculation system for determining its taxable share of a multistate corporation's business income. . . . [¶] The income of which California taxes a percentage is constitutionally limited to a corporation's 'unitary' income. Unitary income normally includes all income from a corporation's business activities, but excludes income that 'derive[s] from unrelated business activity which constitutes a discrete business enterprise,' [citation]. As we have said, this latter 'nonunitary' income normally is not taxable by any State except the corporation's State of domicile (and the States in which the 'discrete enterprise' carries out its business)." (*Hunt-Wesson, Inc. v. Franchise Tax Bd.* (2000) 528 U.S. 458, 460-461 [120 S.Ct. 1022, 1024-1025, 145 L.Ed.2d 974].)

Pursuant to FTB's formula and schedule for dividends deductible under section 24402, some of the dividends received by Taxpayer from certain corporations in certain years were not deductible. For example, in 1998 Taxpayer received a dividend from Farmland Industries of about $11,000, but no part of the dividend was deductible, based on section 24402 and Farmland Industries's paying no California franchise tax in 1998. As to other corporations which paid dividends to Taxpayer, various portions of those dividends were subject to the section 24402 deduction. For example, in

1998, Taxpayer received a total dividend of about $4,800 from Merrill Lynch but only 1.839 percent of that dividend, or about $89, was deductible. As to a total dividend in 1992 of $17,550 from San Diego Gas & Electric, almost all of the dividend, or 99.546 percent, was deductible.

Taxpayer timely filed amended tax returns claiming a dividends received deduction for all dividends received for the years at issue and requested refunds totaling over $800,000, plus interest. Taxpayer asserted as the ground for the refunds that section 24402 violated the commerce clause. FTB denied Taxpayer's claims for refunds. Taxpayer appealed the denial to the State Board of Equalization (Board), which considered the appeal and sustained FTB's action on the ground that the Board "does not have the authority to deny the application of Revenue and Taxation Code section 24402 on constitutional grounds."

In September 2000, Taxpayer filed the instant action for refund of corporate franchise or income tax. In a first amended complaint, Taxpayer asserted that section 24402 is unconstitutional under the commerce clause because it discriminates on its face against interstate commerce by improperly taxing income that is not attributable to business transacted in California and the deduction cannot be justified as a lawful compensatory tax. FTB answered the first amended complaint in May 2001.

On the trial date, October 25, 2001, the parties filed opening trial briefs and a joint stipulation of facts and lodged interrogatories propounded by Taxpayer and FTB's responses. A witness list proffered by FTB indicated it intended to call as witnesses Professors Richard Pomp and Stephen Sheffrin regarding the issue of whether section 24402 violated the commerce clause. In response to FTB's witness list, Taxpayer filed a motion in limine to bar expert testimony on the constitutionality issue. The October 25, 2001 minute order indicates that the parties agreed to bifurcate the trial, with the court adjudicating first the issue of the constitutionality of section 24402 and then, if necessary, the issue of remedy. The court afforded the parties until November 8, 2001, to file responses to the opening briefs. With respect to the motion in limine, the minute order states that FTB would have until November 8, 2001, to file opposition and then "the cause will stand submitted. [¶] If the plaintiff's motion in-limine to bar expert testimony on the constitutionality issue is denied and expert testimony is to be taken, trial will be continued into early next year for that testimony."

In FTB's response to the motion in limine, FTB faulted Taxpayer for failing to obtain any discovery with respect to expert witnesses and instead, "on the day set for trial, Taxpayer file[d] a motion in which it presents to the

Court Taxpayer's assumptions as to the nature of the testimony to be offered by the Board's witnesses and asks that they be barred from testifying because this assumed testimony is inadmissible. Taxpayer is not only tilting at windmills, it is doing so after constructing the very edifices at which it aims its lance." FTB then pointed out that expert opinion testimony properly could be offered as to factual issues arising under the compensatory tax doctrine defense but expressly refused to go into any greater detail as to any such testimony, thus refusing "to give Taxpayer the benefits . . . which it would have received had it exercised the diligence necessary to elicit and refine such information [through discovery]." According to FTB, "Taxpayer's remaining option is to wait until questions are posed to the Board's independent expert witnesses and then interpose such objections as it deems appropriate."

On November 8, 2001, both parties filed responsive trial briefs. FTB's brief addressed the issue of the compensatory tax doctrine, but FTB did not offer any testimony or additional evidence as to that issue.

On November 21, 2001, the court issued its ruling on submitted matter, ruling in pertinent part: "It is agreed that to the extent that a dividend-paying corporation had a larger share of its sales, property and/or payroll in California, plaintiff was entitled under [section 24402] to deduct a larger percentage of the dividends it received—up to a maximum deduction of 70 percent. On the other. hand, the section permits no tax deduction as to dividends generated from business outside of California. . . . [¶] [FTB] maintains that because in-state corporations have already been subjected to franchise tax, the statutory goal is merely compensatory. It argues: 'The purpose of (the statute) is to prevent the imposition of a second tax upon the stream of income leading to the dividend (citations). California's only responsibility is to prevent . . . double taxation . . . .' In effect, defendant argues that both the statute's intent and effect are non-discriminatory.

"This court disagrees. . . . It is a scheme . . . that facially places an unconstitutional burden on interstate commerce.

"Plaintiff's objection to the proffer of live testimony by [defendant's] expert is denied as moot."

At a January 29, 2002 further status conference, which was not reported, the court ordered that the issue of remedy was to be determined after the parties submitted briefs on the issue. FTB thereafter filed a petition for an extraordinary writ, challenging, among other rulings, the ruling denying plaintiff's motion in limine as moot. In its writ petition, FTB argued that if

the Court of Appeal "concludes that factual questions remain to be answered before this issue [whether section 24402 is a permitted compensatory tax] can be resolved, then due process requires that [FTB] be allowed to present the testimony of its named expert witnesses for that purpose." On March 7, 2002, we denied the petition for extraordinary writ. (*Franchise Tax Board v. Superior Court* (Mar. 7, 2002, B156702).)

After the parties submitted briefs on the issue of the appropriate remedy, the court determined that Taxpayer was entitled to recover refunds of corporate income and franchise taxes for the years 1992 to 1998, totaling $811,000, plus interest and costs. The judgment awarded Taxpayer a remedy consisting of the deduction set out in section 24402 for dividends received, as if the dividends were "declared from income which [had] been included in the measure of the taxes imposed . . . upon the taxpayer declaring the dividends." (§ 24402, subd. (a).) Judgment was entered on May 13, 2002. FTB filed a timely notice of appeal from the judgment.

FTB challenges only the finding that section 24402 is unconstitutional under the commerce clause, and not the finding that a tax refund is the proper remedy for the invalidity of section 24402. FTB does not challenge the remedy, and the parties do not discuss that issue, so neither do we. In other words, if we agree with the trial court's finding of unconstitutionality, then we may affirm the judgment without addressing the issue of remedy.

## DISCUSSION

■ As the issue of the constitutionality of section 24402 under the commerce clause is presented on undisputed facts and is one of law, our review is de novo. (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 799-801 [35 Cal.Rptr.2d 418, 883 P.2d 960]; *State of Ohio v. Barron* (1997) 52 Cal.App.4th 62, 67 [60 Cal.Rptr.2d 342] [constitutional issues are reviewed de novo].)

### A. *Section 24402 Is Facially Discriminatory*

■ "The Constitution gives Congress the power to regulate commerce between the states. (U.S. Const., art. I, § 8, cl. 3.) 'Though phrased as a grant of regulatory power to Congress, the [Commerce] Clause has long been understood to have a "negative" aspect that denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce. [Citations.]' [Citation.]" (*Ceridian, supra*, 85 Cal.App.4th at p. 882.) This negative aspect of the commerce clause, also known as the dormant commerce clause (*Fulton Corp. v. Faulkner* (1996) 516 U.S. 325,

331 [116 S.Ct. 848, 854, 133 L.Ed.2d 796] (*Fulton*)), prohibits economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors. (*Ceridian, supra,* 85 Cal.App.4th at p. 882.)

■ In evaluating state regulatory measures under the dormant commerce clause, the United States Supreme Court has held that the first step is to determine whether it regulates evenhandedly with only incidental effects on interstate commerce or discriminates against interstate commerce. (*Fulton, supra,* 516 U.S. at p. 331 [116 S.Ct. at pp. 853-854] [North Carolina's intangibles tax violated the dormant commerce clause].) With respect to state taxation, a state law is treated as discriminatory if it taxes a transaction or incident more heavily when it crosses state lines than when it occurs entirely within the state. (*Ibid.; Ceridian, supra,* 85 Cal.App.4th at p. 882.) "State laws discriminating against interstate commerce on their face are 'virtually *per se* invalid.' " (*Fulton, supra,* 516 U.S. at p. 331 [116 S.Ct. at p. 854].) A law that is discriminatory on its face must be invalidated unless the state can show that it advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives. (*Oregon Waste Systems, Inc. v. Department of Environmental Quality of Ore.* (1994) 511 U.S. 93, 100-101 [114 S.Ct. 1345, 1351, 128 L.Ed.2d 13] (*Oregon Waste*) [Oregon's $2.25 per ton surcharge on disposal of out-of-state waste violated commerce clause in view of $0.85 per ton charge imposed on solid in-state waste].)

"[A] tax may violate the commerce clause even if it has no discriminatory goal or intent, if it is facially discriminatory, or has the *effect* of unduly burdening interstate commerce. [Citations.] 'Absent a compelling justification . . . a State may not advance its legitimate goals by means that facially discriminate against [interstate] commerce.' " (*Ceridian, supra,* 85 Cal.App.4th at p. 884.) "Our cases require that justifications for discriminatory restrictions on commerce pass the 'strictest scrutiny.' [Citation.] The State's burden of justification is so heavy that 'facial discrimination by itself may be a fatal defect.' " (*Oregon Waste, supra,* 511 U.S. at p. 101 [114 S.Ct. at p. 1351].)

■ We conclude that section 24402 is discriminatory on its face because it affords to taxpayers a deduction for dividends received from corporations subject to tax in California, while no deduction is afforded for dividends received from corporations not subject to tax in California. As a result, the dividends received deduction scheme favors dividend-paying corporations doing business in California and paying California taxes over dividend-paying corporations which do not do business in California and pay

no taxes in California. The deduction thus discriminates between transactions on the basis of an interstate element, which is facially discriminatory under the commerce clause. (*Armco Inc. v. Hardesty* (1984) 467 U.S. 638, 642 [104 S.Ct. 2620, 2622, 81 L.Ed.2d 540].) ■ "That the tax discrimination comes in the form of a deprivation of a generally available tax benefit, rather than a specific penalty on the activity itself, is of no moment" under commerce clause jurisprudence. (*Camps Newfound/Owatonna, Inc. v. Town of Harrison* (1997) 520 U.S. 564, 578-579 [117 S.Ct. 1590, 1599, 137 L.Ed.2d 852].)

■ "A regime that taxes stock only to the degree that its issuing corporation participates in interstate commerce favors domestic corporations over their foreign competitors in raising capital among [in-state] residents and tends, at least, to discourage domestic corporations from plying their trades in interstate commerce." (*Fulton, supra,* 516 U.S. at p. 333 [116 S.Ct. at p. 855].) In *Fulton,* the court held invalid under the commerce clause North Carolina's "intangibles tax," which taxed "a fraction of the value of corporate stock owned by North Carolina residents inversely proportional to the corporation's exposure to the State's income tax." (*Id.* at p. 327 [116 S.Ct. at p. 852].)

Like the sliding scale deduction at issue in this case, residents of North Carolina were "entitled to calculate their tax liability by taking a taxable percentage deduction equal to the fraction of the issuing corporation's income subject to tax in North Carolina." (*Fulton, supra,* 516 U.S. at p. 328 [116 S.Ct. at p. 852].) "Thus, a corporation doing all of its business within the State would pay corporate income tax on 100% of its income, and the taxable percentage deduction allowed to resident owners of that corporation's stock under the intangibles tax would likewise be 100%. Stock in a corporation doing no business in North Carolina, on the other hand, would be taxable on 100% of its value. For the intermediate cases, holders of stock were able to look up the taxable percentage for a large number of corporations as determined and published annually by the North Carolina Secretary of Revenue . . . ." (*Ibid.*) The *Fulton* court concluded that "[t]here is no doubt that the intangibles tax facially discriminates against interstate commerce," because such a tax "favors domestic corporations over their foreign competitors in raising capital," and tends "to discourage domestic corporations from plying their trades in interstate commerce." (*Id.* at p. 333 [116 S.Ct. at p. 855].)

*Ceridian* applied the principles in *Fulton* to Revenue and Taxation Code section 24410, which "allows a deduction in computing taxable income ([Rev. & Tax. Code,] § 24401) for 'Dividends received by a corporation

commercially domiciled in California . . . from an insurance company subject to tax imposed by [the "Insurance Taxation" part] of this division at the time of the payment of the dividends and at least 80 percent of each class of its stock then being owned by the corporation receiving the dividend.' " (*Ceridian, supra,* 85 Cal.App.4th at p. 881.) The *Ceridian* court concluded that "a statutory scheme, such as the one before us, that disallows a deduction based on the amount of *property and employees* that the dividend-declaring insurer has in another state, favors domestic corporations over their foreign competitors in raising capital among California corporations, and tends, at least, to discourage domestic corporations from plying their trade in interstate commerce, from purchasing property or hiring employees in other states, and from purchasing subsidiary insurance corporations that do so. Thus, [Revenue and Taxation Code] section 24410, subdivision (b) is unquestionably discriminatory on its face." (*Ceridian, supra,* 85 Cal.App.4th at p. 887.)

"Just as North Carolina [in *Fulton, supra,* 516 U.S. 325,] reduced its intangibles tax in direct proportion to the amount of business the owned corporation did within the state's borders, so too California reduces the dividend tax to the extent such dividends are 'paid from income from California sources,' ([Rev. & Tax. Code,] § 24410, subd. (b)), which is calculated based on the proportionate amount of property, payroll and gross receipts the owned corporation has within California. *Fulton* prohibits such discriminatory treatment." (*Ceridian, supra,* 85 Cal.App.4th at p. 887.)

Because the dividends received deduction of section 24402 discriminates against corporations engaged in interstate commerce in the same fashion as does Revenue and Taxation Code section 24410, *Ceridian* provides persuasive authority to support our conclusion that section 24402 is discriminatory on its face. While FTB correctly points out that *Ceridian* did not address the same statute involved here, and that we are not bound by that opinion, FTB still offers no cogent reason why *Ceridian*'s analysis is not convincing in resolving the commerce clause issue in this case.

We also reject FTB's claim that section 24402 does not violate the "internal consistency doctrine" in assessing whether a tax is discriminatory. "The internal consistency doctrine requires that the imposition of a tax identical to a challenged tax in every state would add no burden to interstate commerce that intrastate commerce did not also bear, and looks at the structure of the challenged tax to see whether its identical application by every state would place interstate commerce at a disadvantage against intrastate commerce." (*D.D.I., Inc. v. State* (2003) 2003 N.D. 32 [657 N.W.2d 228, 234] (*D.D.I.*) [similar dividends received deduction held unconstitutional under commerce clause and was not a valid compensatory

tax].) Here, the imposition of the dividends received deduction by every state would favor intrastate commerce over interstate commerce by giving a greater tax benefit to taxpayers investing in their home state corporations as opposed to out-of-state corporations or corporations engaged in multistate business. Section 24402 violates the internal consistency doctrine.

B. *FTB Fails to Justify Section 24402 as a Compensatory Tax*

 "[A] facially discriminatory tax may still survive Commerce Clause scrutiny if it is a truly ' "compensatory tax" designed simply to make interstate commerce bear a burden already borne by intrastate commerce.' " (*Fulton, supra,* 516 U.S. at p. 331 [116 S.Ct. at p. 854].) "Though our cases sometimes discuss the concept of the compensatory tax as if it were a doctrine unto itself, it is merely a specific way of justifying a facially discriminatory tax as achieving a legitimate local purpose that cannot be achieved through nondiscriminatory means. . . . Under that doctrine, a facially discriminatory tax that imposes on interstate commerce the rough equivalent of an identifiable and 'substantially similar' tax on intrastate commerce does not offend the negative Commerce Clause." (*Oregon Waste, supra,* 511 U.S. at p. 102 [114 S.Ct. at p. 1352].)

The cases have distilled three conditions, or prongs, necessary for a valid compensatory tax: (1) A state must, as a threshold matter, identify the intrastate tax burden for which the state is attempting to compensate, (2) the tax on interstate commerce must be shown roughly to approximate, but not exceed, the amount of the tax on intrastate commerce, and (3) the events on which the interstate and intrastate taxes are imposed must be substantially equivalent, that is, they must be sufficiently similar in substance to serve as mutually exclusive proxies for each other. (*Fulton, supra,* 516 U.S. at pp. 332-333 [116 S.Ct. at pp. 854-855].)

Addressing the first prong, as explained in *Oregon Waste,* "The prototypical example of substantially equivalent taxable events is the sale and use of articles of trade. [Citation.] In fact, use taxes on products purchased out of state are the only taxes we have upheld in recent memory under the compensatory tax doctrine." (*Oregon Waste, supra,* 511 U.S. at p. 105 [114 S.Ct. at p. 1353].)

 FTB argues that "[t]he intrastate burden that section 24402 compensates for is the California tax burden on the income of the dividend payor, when that income is again included in the income of the corporate dividend recipient." Yet the United States Supreme Court in *Fulton,* citing *Oregon*

*Waste,* warned "of the danger of treating general revenue measures as relevant intrastate burdens for purposes of the compensatory tax doctrine. '[P]ermitting discriminatory taxes on interstate commerce to compensate for charges purportedly included in general forms of intrastate taxation would allow a state to tax interstate commerce more heavily than in-state commerce anytime the entities involved in interstate commerce happened to use facilities supported by general state tax funds.' [Citation.] We declined then [in *Oregon Waste*], as we do now, 'to open such an expansive loophole in our carefully confined compensatory tax jurisprudence.' " (*Fulton, supra,* 516 U.S. at p. 335 [116 S.Ct. at p. 856].)

A "double taxation" argument similar to that made by FTB was rejected by the Supreme Court of North Dakota in *D.D.I., supra,* 657 N.W.2d 228, which involved a similar dividends received deduction. "Although avoiding double taxation of North Dakota income is a permissible goal, the Commissioner has not identified any specific in-state activity or benefit received by the taxpayers to justify the compensatory levy on their dividends received from out-of-state corporations. The State of North Dakota does not have a general sovereign interest in taxing income earned out-of-state and must identify some specific in-state activity or benefit to justify a compensatory levy. [Citation.] The Commissioner has failed to establish such an in-state benefit to the taxpayers." (*Id.* at p. 234.)

As pointed out by the court in *D.D.I.,* the double taxation argument also ignores the corporate income tax that an out-of-state corporation's state might impose. Thus, the dividends received deduction "does not avoid double taxation for out-of-state corporate income and does not roughly approximate the tax on intrastate commerce . . . ." (*D.D.I., supra,* 657 N.W.2d at p. 234.)

Based on the same reasoning set out in *Fulton* and *D.D.I.,* we conclude that FTB has failed to establish the first prong of the compensatory tax doctrine.

The second prong of the compensatory tax is that it must roughly approximate the amount of the tax on intrastate commerce. The Supreme Court in *Oregon Waste* acknowledged the difficulty of satisfying this element when the state contends that the tax burden on interstate commerce compensates for the burden of state income taxes. Whether or not the interstate tax burden roughly approximates the intrastate tax burden "is difficult to determine, as '[general] tax payments are received for the general purposes of the [government], and are, upon proper receipt, lost in the general revenues.' " (*Oregon Waste, supra,* 511 U.S. at p. 104 [114 S.Ct. at p. 1353].)

In *Fulton,* the court discussed the theory that one of the services provided by the state of North Carolina, and supported through its general corporate income tax, is the maintenance of a capital market for corporations wishing to sell stock to state residents. The Secretary of Revenue of North Carolina argued that the state "may require those companies to pay for the privilege of access to the State's capital markets by a tax on the value of the shares sold." (*Fulton, supra,* 516 U.S. at p. 335 [116 S.Ct. at p. 856].) The *Fulton* court found the argument unconvincing. "North Carolina, like most States, regulates access to its capital markets by means of blue sky laws, [citation], and their accompanying regulations, which prescribe who may sell securities in North Carolina, the procedures that must be followed to do so, and the fees imposed for the privilege. [Citations.] Absent probative evidence to the contrary, which the [State] has not supplied, we can reasonably assume that North Carolina has provided for the upkeep of its capital market through these provisions, not through the general corporate income tax. [¶] If the corporate income tax does not support the maintenance of North Carolina's capital market, then the State has not justified imposition of a compensating levy on the ownership of shares in corporations not subject to the income tax." (*Id.* at p. 336 [116 S.Ct. at p. 856], fn. omitted.)

As explained in *Fulton,* the corporate income tax "is a general form of taxation, not assessed according to the taxpayer's use of particular services, and before its revenues are earmarked for particular purposes they have been commingled with funds from other sources. As a result, the [State] cannot tell us what proportion of the corporate income tax goes to support the capital market, or whether that proportion represents a burden greater than the one imposed on interstate commerce by the intangibles tax. . . . [¶] . . . Where general forms of taxation are involved, we ordinarily cannot even begin to make the sorts of qualitative assessments that the compensatory tax doctrine requires." (*Fulton, supra,* 516 U.S. at p. 338 [116 S.Ct. at p. 857].)

The court in *Fulton* acknowledged that "[w]hile we need not hold that a State may never justify a compensatory tax by an intrastate burden included in a general form of taxation, the linkage in this case between the intrastate burden and the benefit shared by out-of-staters is far too tenuous to overcome the risk posed by recognizing a general levy as a complementary twin." (*Fulton, supra,* 516 U.S. at p. 336 [116 S.Ct. at p. 856].) Thus, while it may not have been "inconceivable, however unlikely, that a capital markets component of the corporate income tax exceeds the intangibles tax in magnitude," the court in *Fulton* concluded that the state had not met its burden of demonstrating the second prong of the compensatory tax doctrine. (*Id.* at p. 338 [116 S.Ct. at p. 857].)

As in *Fulton,* FTB also has not met its burden of demonstrating the second prong of the compensatory tax doctrine.

The third prong of the compensatory tax doctrine requires that the compensating taxes fall on substantially equivalent events. FTB argues that this condition is met because corporate income and the dividend paid from that income are the "same dollars" and are substantially similar events. Yet, *Fulton* expressly disapproved of this analysis with respect to the intangibles tax. "[W]e find that the intangibles tax is not functionally equivalent to the corporate income tax." (*Fulton, supra,* 516 U.S. at p. 339 [116 S.Ct. at p. 858].) Because the objective of the equivalent-event requirement is to enable in-state and out-of-state businesses to compete on an equal footing, "[t]his equality of treatment does not appear when the allegedly compensating taxes fall respectively on taxpayers who are differently described, as, for example, resident shareholders and corporations doing business out of state. A State defending such a tax scheme as one of complementary taxation, therefore, has the burden of showing that the actual incidences of the two tax burdens are different enough from their nominal incidences so that the real taxpayers are within the same class, and that therefore a finding of combined neutrality on interstate competition would at least be possible." (*Id.* at p. 340 [116 S.Ct. at p. 858].)

The court in *Fulton* noted that determining whether the tax burden is shifted out of state, rather than borne by in-state producers and consumers, requires complex factual inquiries, and that courts as institutions are poorly equipped to evaluate with precision the relative burdens of various methods of taxation. (*Fulton, supra,* 516 U.S. at pp. 341-342 [116 S.Ct. at p. 859].) "Indeed, the general difficulty of comparing the economic incidence of state taxes paid by different taxpayers upon different transactions goes a long way toward explaining why we have so seldom recognized a valid compensatory tax outside the context of sales and use taxes." (*Id.* at p. 342 [116 S.Ct. at p. 859].)

Thus, under the third prong of the compensatory tax doctrine, FTB must establish that the burden created by the structure of the dividends received deduction falls on the same class of taxpayers as does the corporate income tax. Yet the burden of section 24402 is on the taxpayer receiving dividends, while the burden of the corporate income tax is on the payer corporation. FTB has failed to offer any factual or logical support for its claim that the actual incidences of these two taxes are imposed upon the same class of taxpayers (see *Fulton, supra,* 516 U.S. at p. 340, fn. 6 [116 S.Ct. at p. 858]) or that the dividends received deduction amounts to a clear equivalent for the corporate income tax. As stated by the court in *Fulton*, "there are reasons to doubt the [State's] contention that the corporate income tax amounts to a clear equivalent for the burden on shareholding imposed by the intangibles tax." (*Id.* at p. 344 [116 S.Ct. at p. 860].) Because the doubts expressed in

*Fulton* also arise here, we conclude that FTB fails to establish the third prong of the compensatory tax doctrine.

As FTB fails to justify section 24402 as a compensatory tax, and it impermissibly discriminates against interstate commerce, the statute violates the commerce clause.

## C. *Expert Witness Testimony*

■ FTB contends that the trial court erroneously denied it the opportunity to present expert testimony relating to the compensatory tax doctrine. FTB fails to show that it ever proffered or sought to introduce any such testimony, that it made an offer of proof, or that the trial court made any ruling on the matter. In other words, there is simply no ruling for us to review. A party ,on appeal cannot successfully complain because the trial court failed to do something which it was not asked to do. (*Chyten v. Lawrence & Howell Investments* (1994) 23 Cal.App.4th 607, 617 [46 Cal.Rptr.2d 459].)

DISPOSITION

The judgment is affirmed.

Ortega, Acting P. J., and Vogel (Miriam A.), J., concurred.

Appellant's petition for review by the Supreme Court was denied August 27, 2003. Werdegar, J., did not participate therein.