Filed 12/10/13  Bornemann v. Gamboa CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| PAUL H. BORNEMANN, | |
| Plaintiff and Respondent, | E055494 |
| v. | (Super.Ct.No. CIVBS1100571) |
| ANDREW M. GAMBOA, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Kirtland L. Mahlum, Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Reversed.

Law Office of Stanley W. Hodge and Stanley W. Hodge for Defendant and Appellant.

Law Office of Robert D. Conaway and Robert D. Conaway for Plaintiff and Respondent.

1

Plaintiff, Captain Paul H. Bornemann, an army doctor, and defendant, Warrant Officer Andrew M. Gamboa, had two confrontations at Fort Irwin, one verbal and one involving a threat with a baton, after Gamboa complained about Bornemann's wife. The incidents led to mutual restraining orders issued by the military. Bornemann then petitioned the superior court for civil harassment restraining orders. Following a bench trial, the court suggested that the parties seek an extension of the military no-contact orders, to avoid impacting Gamboa's military career. However, after doing so, the court disapproved of the military stay-away orders and entered judgment in favor of Bornemann, with no-contact and stay-away orders against Gamboa, along with an order that defendant not own or possess any weapons. Gamboa appealed.

On appeal, Gamboa argues that (1) the superior court lacked jurisdiction to issue orders contrary to the orders issued by the United States Army, and (2) defendant was denied due process when the court considered unsworn statements by counsel for the school district regarding the difficulties of enforcing restraining orders at the school where the children of both parties had to be picked up and dropped off. We requested supplemental briefing on whether (a) the evidence is sufficient to support the finding of civil harassment, (b) the court applied the appropriate burden of proof, and (c) trial court abused its discretion by indicating that an extension of the military no-contact orders

would obviate the need for civil harassment restraining orders and later rejecting the military orders.  We reverse.[1]

## BACKGROUND

Plaintiff Paul Bornemann, a captain in the United States Army, and his wife Gina, lived in the community known as Cracker Jack Flats, a part of Fort Irwin, for the past two years.  Andrew Gamboa is a Warrant Officer stationed at Fort Irwin, who has served in the military for 15 years.  Gina volunteered as an honorary "mayor" of Cracker Jack Flats.  In that capacity, she met monthly with the garrison commander to discuss safety issues relating to children in the playground, and housing concerns of residents.  Her children attended school at Fort Tiefort School in the Cracker Jack Flats community.

Prior to her first encounter with Gamboa, Gina was concerned about incidents involving people speeding through the community and failing to stop at stop signs.  At some point there had been a hit-and-run incident in the area.  As an advocate for the community, if she saw someone speeding, she would take note of people speeding and attempt to determine if the person had a pattern of speeding through the community and

---

[1] Bornemann objects to "the expansion of the issues [being] reviewed on appeal," by means of our request for supplemental briefing.  However, it has long been held that the reviewing court is not precluded from considering and deciding points which may not have been urged and argued in the briefs originally filed if it appears to the court that an important legal principle is necessarily involved and that a proper disposition of the case requires discussion and decision of that point.  (*Kurlan v. Columbia Broadcasting System, Inc.* (1953) 40 Cal.2d 799, 806, citing *Schubert v. Lowe* (1924) 193 Cal. 291, 294; see also Gov. Code, § 68081.)  In other words, an appellate court has the power to raise issues on its own motion.  (*San Joaquin Raptor/Wildlife Rescue Center v. County of Stanislaus* (1994) 27 Cal.App.4th 713, 741, fn. 12, citing *Walton v. City of Red Bluff* (1991) 2 Cal.App.4th 117, 129.)

the school property. When she observed someone speeding, or going the wrong way on the school grounds, she would approach the person, introduce herself as the mayor of Cracker Jack Flats, and ask them to drive on the right side of the street.

On September 26, 2011, Gina observed Gamboa driving through the Community towards the school in a new white Cadillac, and opined he was speeding.[2] The next day, Gina saw the same car and motioned to Gamboa to slow down. She also took a photograph of his car. On Wednesday, September 28, 2011, Gina observed Gamboa, who was parked, as she walked to pick up her children, while carrying her youngest child. Gina intended to talk to Gamboa. She extended her hand to greet him and he rolled his window down, telling her he knew who she was, and that she was well known in the 699 Maintenance Company.

As Gamboa exited his car, Gina told him he was speeding through school property. Gamboa towered over her and informed her they were watching her, that she was well-known, and directed her not to take photographs of him anymore. Gamboa then turned and walked towards the school, at which time Gina took a photograph of the license number of his vehicle. Gina went into the school and reported that she had been threatened. A week or two later, Gina saw Gamboa in the school parking lot again,

---

[2] When asked if she was authorized to stop people for traffic violations, Bornemann's attorney objected, and the court sustained the objection. Nevertheless, the record shows Gina's duties as honorary mayor only related to bringing safety concerns or community comments to the attention of the Garrison Commander, and did not include traffic control. In any event, while it may be a typographical error, Gina testified that the speed limit through Cracker Jack Flats was 50 miles per hour.

4

where Gamboa had parked. He exited his car and as he passed her car, he turned and looked at her, smiling mockingly.

After that incident, Gina noticed Gamboa driving in front of the Bornemann home on his way to the school. On different days, Gina saw Gamboa parked in front of the school parking lot. On one occasion, Gina noticed that Gamboa was parked about 100 feet from her house. The Bornemanns live on the street leading to the school, about five houses down from the entry of the school. Gina was familiar with Capt. Mullins and his wife Janice, who lived on the same street, one house away from the school. Capt. Mullins is a friend of Gamboa's, and Mullins' wife is a friend of Gamboa's wife. Because Gamboa's wife does not drive and is friends with Capt. Mullins' wife, Gamboa would drop his wife off at the Mullins residence, so his wife could pick up their daughter at school and walk her home. Gamboa did not know where the Bornemanns resided.

On September 30th, Gamboa made a complaint against Gina but Detective Braddy advised him they would handle the matter at a lower level. That same day, as Gamboa was driving, Capt. Bornemann jumped out in front of his car while walking his children to school. In the middle of the street, Bornemann "postured up" in a threatening manner. Realizing that the person who jumped in front of his car was probably the husband of Gina, and upset over the complaint against Gina, Gamboa went to Detective Braddy and informed her of the incident. Detective Braddy informed Gamboa that the Bornemanns would stay away from him, and Gamboa dropped the charge.

After Gamboa reported this incident to Detective Braddy he put an ASP (Armament Systems and Procedures) telescoping baton in his car. Gamboa had suffered

a broken hand a few years earlier, defending himself when he attempted to break up a fight between some of his soldiers and some bikers in a bar while stationed in Korea. He did not want to hurt his hand again, so he put the ASP in the car to use as a deterrent. Gamboa told Detective Braddy that he had a baton and had not been informed that it was illegal.

On October 26, 2011, Paul Bornemann picked up his children from school at 1:00 p.m., had lunch with his family at home, and got on his bicycle to return to work. As he rode his bicycle, he noticed a white Cadillac that his wife had said belonged to the person who was threatening and harassing her. The white Cadillac was driving in the direction of his residence and Bornemann saw the driver point at him and make a laughing gesture. Gina had told Bornemann that she had seen the car parked in front of their house the previous day, and Bornemann was afraid Gamboa would park in front his house and harass his wife again. So Bornemann turned to follow the vehicle in hopes he could identify Gamboa and obtain a keep-away order from Gamboa's commander.

As Bornemann turned, he saw Gamboa park almost directly in front of Bornemann's house. Bornemann saw a woman and child exit the vehicle and enter a building. Bornemann rode his bicycle and parked it next to the sidewalk, adjacent to Gamboa's vehicle, crossed in front of the vehicle and approached the driver's door to check Gamboa's nametape. Gamboa made a nodding gesture, reached for something and exited the vehicle, deploying the ASP baton over his head. Gamboa yelled to Bornemann, "Let's do this," and Bornemann stepped back, out of range. The two men

6

exchanged words, and then Gamboa got back in his car and drove off, waving mockingly at Bornemann.

Bornemann called the police and made a report to Sgt. Driggers. Later, Bornemann learned Gamboa had gone to the police station, also to report the incident. After the altercation, Gamboa gave the baton to the military police. Gamboa's company commander issued a no-contact order that was effective until January 30, 2012, unless sooner rescinded. However, on November 4, 2011, Bornemann filed a petition for a civil harassment restraining order (Code Civ. Proc., § 527.6) because he felt the military police did not want to cooperate. That same day, Gamboa filed a similar petition, seeking mutual restraining orders.

The court conducted a bench trial on November 21, 2011. At the conclusion of his testimony, Gamboa informed the court he had no objection to restraining orders but that he was required to qualify with a firearm every six months so he could be deployed if needed. After hearing the testimony of all witnesses, the court determined that Bornemann's wife was intimidated by Gamboa, whether Gamboa intended it or not, and that Bornemann felt he had to take the action he did to protect his family. However, the court felt that military personnel have to be able to bear arms, but that a restraining order would have to include a no weapon order. The court stated:

> "I would like to do this: I would like to give the Army -- we've got that no contact order. I would like them to extend that for a year. You have no reason to contact -- to come into contact with Captain Bornemann. You know now where he lives. You have no reason to come into contact with

7

his wife, except to pick up and delivery, [*sic*] and you just have no contact. [¶] What I would like to do is the -- and I'm going to be the first to say, I haven't done this before, so technically I'm not sure how accurate, technically correct it is. I would like to continue this for two weeks, keep the temporary order in effect. See now if you can talk to the military and you can say, Look, I'm screwed, because I will make the protective order against you, unless they agree to make that a one year stay-away order, and that shouldn't effect [*sic*] you at all to just stay away from him and his family."

Gamboa and Bornemann's counsel agreed. The court cautioned that if Gamboa contacted either Bornemann or his wife, the civil harassment order would be issued. Gamboa was ordered not to possess an ASP, and the matter was continued.

On December 5, 2011, the parties returned to court and the court reviewed newly extended military no-contact order.[3] The court noted that the order was a mutual order, although the court did not find Bornemann at fault. The court was dissatisfied with the military order "as far as providing the necessary protection that I was concerned about."

The court found by clear and convincing evidence that Gamboa threatened Bornemann, and issued a three-year injunction against contacting, harassing, or threatening the Bornemanns, ordered Gamboa to keep at least 100 yards away from

---

[3] We grant Gamboa's May 8, 2012 request for judicial notice of the military protective order dated November 29, 2011, which continued in effect until December 31, 2012.

8

Bornemann's residence, work place or vehicle, and prohibited Gamboa from possessing firearms or an ASP. Gamboa was also ordered to pay one-half of Bornemann's attorney fees and costs in the amount of $2,400. Gamboa timely appealed.

## DISCUSSION

### 1.     *Jurisdiction to Issue Protective Orders and Policy Considerations.*

Gamboa argues that the superior court lacked jurisdiction to issue orders contradictory to the military protective orders (MPOs) issued by the army commander. In response, Bornemann argues that federal law, specifically 10 United States Code, section 1561a, provides that a civilian protective order is entitled to comity on a military installation and that public policy favors enforcement of the civilian orders because the MPO was not a proper remedy nor one of equal force and effect. Bornemann also asks to apply principles of judicial estoppel to bar Gamboa's appeal.

We have been unable to find any case law addressing the exclusive or cooperative nature of the parallel procedures for obtaining injunctive relief against harassment. Unfortunately, neither party has pointed us in the right direction. Nevertheless, a review of the parallel statutory schemes informs us that both statutory schemes contemplate reciprocity of enforcement, full faith and credit, and comity.

On the one hand, 10 United States Code section 1561a, subdivision (a), contains a chapter devoted to domestic violence and stalking. That section provides that "[a] civilian order of protection shall have the same force and effect on a military installation as such order has within the jurisdiction of the court that issued such order." That section

goes on to define the term "civilian order of protection" by referring to the meaning given the term "protection order" in section 2266(5), of title 18. (10 U.S.C. § 1561a(b).)

Title 18 of the United States Code sections 2261 to 2266, is known as the Violence Against Women Act. Section 2266(5) of title 18 of the United States Code, provides for full faith and credit given to protection orders. The term "protection order," as defined in subdivision (5), includes: "(A) any injunction, restraining order, or any other order issued by a civil or criminal court for the purpose of preventing violent or threatening acts or harassment against, sexual violence, or contact or communication with or physical proximity to, another person, including any temporary or final order issued by a civil or criminal court whether obtained by filing an independent action or as a pendente lite order in another proceeding so long as any civil or criminal order was issued in response to a complaint, petition, or motion filed by or on behalf of a person seeking protection; and [¶] (B) any support, child custody or visitation provisions, orders, remedies or relief issued as part of a protection order, restraining order, or injunction pursuant to State, tribal, territorial, or local law authorizing the issuance of protection orders, restraining orders, or injunctions for the protection of victims of domestic violence, sexual assault, dating violence, or stalking."

Because the definition of "protection order" as found in section 1561a of title 10 of the United States Code was imported from the statutory definition found in the chapter governing domestic violence and stalking (18 U.S.C. § 2266(5)), it is apparent that the comity provided under title 10 United States Code section 1561a was intended to address domestic violence protection orders, making them enforceable on military installations.

10

This case is not a domestic violence case, so the provisions of that code section are informative but not controlling.

Closer to point, section 1567 of title 10 of the United States Code provides that a MPO issued by a military commander shall remain in effect until such time as the military commander terminates the order or issues a replacement order. Section 1567a of title 10 of the United States Code requires mandatory notification of the issuance of military protective orders to civilian law enforcement. Although these two statutes were part of an appropriations package that included a provision for establishing an information database of sexual assault incidents in the armed forces (Pub. Law 110-417, §§ 561-563, 122 Stat. 4356), there is no restricted definition that limits the notification of an MPO to sexual assault cases. Further, other codes within the same title deal with various topics unrelated to sexual assault or harassment. We interpret the statutory reference requiring notice of an MPO to civilian law enforcement strongly implies that such orders are entitled to reciprocal full faith and credit.

Section 1567 of title 10 of the United States Code statute expressly authorizes a base commander to issue a protective order, which remains in effect until the commander terminates it or modifies it. Civilian authorities receive mandatory notification of MPOs. (10 U.S.C. § 1567a.) We conclude such an MPO is the functional equivalent of a protective order issued by a state court and is entitled to full force and effect, given the mandatory notification of civilian authorities. (See *United States v. Banks* (9th Cir. 1976) 539 F.2d 14, 16 [holding the base commander qualifies as a neutral and detached magistrate for the purpose of determining probable cause for a search warrant].) We see

11

no reason why Congress would compel the notification of civilian authorities of an MPO if it did not intend the orders to be entitled to full faith and credit.

Although the statute relied upon by Bornemann deals with domestic violence protective orders, it shows that Congress intended for parallel statutory schemes to complement each other, to give full faith and credit, as well as comity, to the protective orders of both civilian and military origin.

However, we have found no authority for the proposition that a civilian court can rescind, reverse or vacate an MPO, any more than a military commander can nullify a civilian order. The authority of a military commander over his post, as conferred on him by statute and regulations, is broad, and judicial review of an exercise of that authority is limited. (*Committee to Free Ft. Dix 38 v. Collins* (1970) 429 F.2d 807, 809; 32 C.F.R. § 552:18(c), (d).) "By virtue of his position, the commander of a military installation has acquired unique responsibilities in connection with the health, safety, welfare, morale, and efficiency of those placed under his command. This is the result of the manifest necessity that his personnel be kept at peak efficiency in order that the performance of his mission will not be jeopardized." (*United States v. Harris* (Ct.Mil.App. 1978) 5 M.J. 44, 59.) Therefore, while the superior court had authority to entertain Bornemann's petition, it lacked authority to vacate, modify, or eliminate the mutual protective orders made by the base commander.

Gamboa did not seek a dismissal of the action, but instead filed a counter-petition for his own injunctive relief, so he submitted to the jurisdiction of the superior court. Thus, the trial court had jurisdiction to entertain the civil harassment proceedings.

12

2.    *There Was No Due Process Violation In Allowing Counsel for the School District to Address the Court.*

Gamboa argues that his due process rights under the Fifth Amendment of the United States Constitution as well as the California Constitution, article I, section 7, were violated when the court permitted the counsel for the school district to make an unsworn statement during the trial.  We disagree.

Gamboa cites, without analysis, the cases of *Goldberg v. Kelly* (1970) 397 U.S. 254 [90 S.Ct. 1011, 25 L.Ed.2d 287], and *Skelly v. State Personnel Board* (1975) 15 Cal.3d 194 in support of his position.  It is well settled that parties in civil proceedings, including administrative hearings, have a due process right to cross-examine and confront witnesses.  (*Dole Bakersfield v. Workers' Comp. Appeals Bd.* (1998) 64 Cal.App.4th 1273, 1276.)  Whether or not an erroneous denial of the right to fully cross-examine a witness is a denial of due process depends on the facts of the particular case.  (*McCarthy v. Mobile Cranes, Inc.* (1962) 199 Cal.App.2d 500, 506.)

Here, Brian Bock, counsel for the school district appeared and made a statement to the court requesting a "carve out" to deal with incidental contact between the parties.  He explained that such an order is needed to address situations in which parents come into contact with each other inadvertently in dropping off or picking up children attending the school.  He did not testify as a witness to any of the events leading up to the action.

Evidence Code section 711 provides that at the trial of an action, a witness can be heard only in the presence and subject to the examination of all the parties to the action, if they choose to attend and examine.  A communication can be characterized as "evidence"

13

only if the information was considered by the court for its bearing on the issues resolved by the findings in its decision; if the information was not so considered, it is not evidence. (See *Mathew Zaheri Corp. v. New Motor Vehicle Bd.* (1997) 55 Cal.App.4th 1305, 1314 [involving an ex parte communication received by an administrative law judge regarding threats a party received from plaintiff].)  Bock did not testify to any of the events that led up to the petition.

Gamboa did not request to examine or cross-examine the school district's counsel, so any error was forfeited.  (*Farmer Bros. Co. v. Franchise Tax Bd.* (2003) 108 Cal.App.4th 976, 993; *Chyten v. Lawrence & Howell Investments* (1993) 23 Cal.App.4th 607, 617.)  Even constitutional rights may be forfeited.  (*People v. Barnum* (2003) 29 Cal.4th 1210, 1224.)

Further, Gamboa cannot complain because he was benefitted by the procedure. Only a party whose interest is injuriously affected by the order may complain.  (*In re Alex U.* (2007) 158 Cal.App.4th 259, 266 [minor could not complain of order requiring his parents to pay the costs of his care and maintenance].)  The information provided by Bock was that the court should make an allowance for inadvertent or incidental contact between the parties in connection with encounters at the school in the event it ordered an injunction, which he referred to as a "carve out."  A "carve out" of the injunction, to allow for incidental contact, was beneficial to Gamboa, since he could be exposed to criminal proceedings for violating a court order any time he came within 100 yards of Bornemann when taking or picking up his child to and from the school.

14

Any irregularity in allowing the individual to offer a brief statement was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824].) There was no error in allowing the counsel for the school district to make an unsworn statement.

3. ***There Is Insufficient Evidence to Support the Finding that Gamboa Harassed Bornemann.***

We requested supplemental briefing on the issue of whether the court made findings of harassment using the appropriate burden of proof, and whether there was sufficient evidence to support the judgment. At the court trial, the commissioner found by clear and convincing evidence that Gamboa threatened Bornemann, but did not address the essential elements of civil harassment. Given that Bornemann presented evidence of only one confrontation involving Gamboa which was initiated by Bornemann, given that the incident involving Bornemann's wife was initiated by her, and given the evidence that Gamboa's presence on the street where the Bornemanns resided was for a legitimate purpose, there was no course of conduct such as support a finding of civil harassment within the meaning of Code of Civil Procedure section 527.6.

a. ***Standard of Review***

We review a judgment pursuant to Code of Civil Procedure section 527.6 for substantial evidence. In doing so, we resolve all factual conflicts and questions of credibility in favor of the prevailing party and indulge in all legitimate and reasonable inferences to uphold the finding of the trial court if it is supported by substantial evidence which is reasonable, credible and of solid value. (*Schild v. Rubin* (1991) 232 Cal.App.3d

15

755, 762.) We may not, however, consider the supporting evidence in isolation, and disregard any contradictory evidence; rather, we must review the entire record. (*Fillpoint, LLC v. Maas* (2012) 208 Cal.App.4th 1170, 1176, citing *Kidron v. Movie Acquisition Corp.* (1995) 40 Cal.App.4th 1571, 1581.)

### b. Legal Principles and Elements of Civil Harassment

Code of Civil Procedure section 527.6 authorizes and provides a procedure by which a person who has been harassed may obtain an injunction under specified circumstances prohibiting any further harassment. (*City of Los Angeles v. Animal Defense League* (2006) 135 Cal.App.4th 606, 614; *Ensworth v. Mullvain* (1990) 224 Cal.App.3d 1105, 1109.)

Harassment is defined as unlawful violence, a credible threat of violence, or a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, or harasses the person, and that serves no legitimate purpose. (Code Civ. Proc., § 527.6, subd. (b).) "Unlawful violence" is defined as "any assault or battery, or stalking as prohibited in Section 646.9 of the Penal Code, but shall not include lawful acts of self-defense or defense of others." (Code Civ. Proc., § 527.6, subd. (b)(7).) A credible threat of violence is defined as a "knowing and willful statement or course of conduct that would place a reasonable person in fear for his or her safety . . . and that serves no legitimate purpose." (Code Civ. Proc., § 527.6, subd. (b)(2).)

To qualify as a "course of conduct," there must be "a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose, including following or stalking an individual, making harassing telephone calls

16

to an individual, or sending harassing correspondence to an individual by any means, including, but not limited to, the use of public or private mails, interoffice mail, facsimile, or computer email." (Code Civ. Proc., § 527.6, subd. (b)(3).) The course of conduct must be such as would cause a reasonable person to suffer substantial emotional distress to the plaintiff. (*R.D. v. P.M.* (2011) 202 Cal.App.4th 181, 188; *Thomas v. Quintero* (2005) 126 Cal.App.4th 635, 662-663; *Ensworth v. Mullvain, supra,* 224 Cal.App.3d at p. 1109.)

Additionally, the conduct must evidence a continuity of purpose, and comprise more than one event which seriously alarms, annoys or harasses the plaintiff. (*Leydon v. Alexander* (1989) 212 Cal.App.3d 1, 4.) A single incident is insufficient to meet the statutory requirement of a "course of conduct." (*Ibid.*)

An injunction restraining future conduct is authorized by Code of Civil Procedure section 527.6 only when it appears from the evidence that the harassment is likely to recur in the future. (*Russell v. Douvan* (2003) 112 Cal.App.4th 399, 403-404; *Scripps Health v. Marin* (1999) 72 Cal.App.4th 324, 332.) The reason for this rule is that an injunction serves to prevent future injury and is not applicable to wrongs that have been completed. (*Id.* at p. 402; see also *Haley v. Casa Del Rey Homeowners Assn.* (2007) 153 Cal.App.4th 863, 873.) The purpose of an injunction under Code of Civil Procedure section 527.6 is not to punish for past acts of harassment, but rather to provide quick relief and prevent future harassment. (*Russell,* at p. 403.)

Code of Civil Procedure section 527.6 does not define the phrase "substantial emotional distress." (*Schild v. Rubin, supra,* 232 Cal.App.3d at p. 762.) However, in

17

*Schild,* the reviewing court applied meaning ascribed to the meaning applied to the analogous tort of intentional infliction of emotional distress, and held that it means highly unpleasant mental suffering or anguish "'from socially unacceptable conduct,'" which entails such intense, enduring and nontrivial emotional distress that "'no reasonable [person] in a civilized society should be expected to endure it.'" (*Schild,* at pp. 762-763, citing *Fletcher v. Western National Life Ins. Co.* (1970) 10 Cal.App.3d 376, 397.) Express findings of emotional distress are not required, but rather are necessarily implied from a finding that a defendant knowingly and willfully engaged in a course of conduct that seriously alarmed, annoyed or harassed the plaintiff, and that the plaintiff actually suffered substantial emotional distress. (*Ensworth v. Mullvain* (1990) 224 Cal.App.3d 1105, 1112-1113.)

The statute expressly provides that constitutionally protected activity is not included within the meaning of the phrase, "course of conduct." (Code Civ. Proc., § 527.6, subd. (b)(3); *R.D. v. P.M., supra,* 202 Cal.App.4th at p. 188; *Thomas v. Quintero, supra,* 126 Cal.App.4th at p. 652.) There is a fundamental right to pursue a lawful occupation. (*Ensworth v. Mullvain, supra,* 224 Cal.App.3d at p. 1113.) One is engaged in legitimate activity when parking on an easement alongside one's driveway. (*Byers v. Cathcart* (1997) 57 Cal.App.4th 805, 812.) Playing basketball in one's back yard for less than 30 minutes at a time, and for no more than five times per week, does not constitute unlawful harassment under Code of Civil Procedure section 527.6, since it would not cause a reasonable person to suffer substantial emotional distress. (*Schild v. Rubin,*

*supra,* 232 Cal.App.3d at p. 765.)  And by statutory definition, self-defense or defense of others does not constitute unlawful violence.  (Code Civ. Proc., § 527.6, subd. (b)(1).)

### c.    *Analysis*

Gina Bornemann initiated the very first encounter with Gamboa when she accosted him and photographed his car, risking the possibility that Gamboa would not take kindly to her interference.  Gina testified Gamboa told her they were watching her, causing her to feel that Gamboa was stalking her when she observed his car driving down the street on which she lived with her family, and when she saw his vehicle parked a short distance away.  However, the record does not show that Gamboa knew where the Bornemann family lived, and the evidence was undisputed that a friend of Gamboa's lived a few houses down on the same street, and that the street in question led to the school property.

Gamboa had a legitimate purpose in driving down the street and parking near the residence of his friend when taking his wife and child to visit, or dropping off his child at the school.  There was no evidence that Gamboa's conduct of driving on the road leading to the school or parking near his friend's house was intentionally done for the purpose of harassing the Bornemann family.  Since Gamboa had a legitimate purpose in driving and parking on the street, his conduct did not constitute harassment.  (See *Byers v. Cathcart, supra,* 57 Cal.App.4th at p. 812 [parking one's car on driveway easement did not constitute harassment because it was for a legitimate purpose].)  Smiling mockingly may be rude, but it is constitutionally protected activity which would not cause a reasonable person to suffer substantial emotional distress.  There was insufficient evidence to

19

support an inference Gamboa stalked or harassed Gina and the court did not find Gamboa harassed her. Since the incident involving Gina was not alleged in the petition, we turn to Bornemann's evidence.

The court found Gamboa harassed Bornemann by threatening him. However, there was but a single incident, the court did not find that there was a likelihood such conduct would recur, a requirement for an injunction, and it did not consider whether Gamboa's conduct might be justified. In this regard, "'[c]ontext is everything in threat jurisprudence.'" (*Huntingdon Life Sciences, Inc. v. Stop Huntingdon Animal Cruelty USA, Inc.* (2005) 129 Cal.App.4th 1228, 1250.) An alleged threat must be analyzed in light of the entire context and under all the circumstances, including prior violence by third parties. (*Id.* at p. 1251, citing *Planned Parenthood of Colombia/Willamette, Inc. v. American Coalition of Activists* (9th Cir. 2002) 290 F.3d 1058, 1077.)

Bornemann testified to a single incident, but the evidence is undisputed that on two separate occasions Bornemann pulled out in front of Gamboa's vehicle in order to stop Gamboa, with the intention of confronting him. In other words, without investigating his wife's allegations, Bornemann himself provoked Gamboa in two separate incidents. After the first incident, Gamboa, whose hand had been broken previously, put an ASP baton in his car for his own protection. While Gamboa's action escalated the level of violence, it was provoked by Bornemann's hostile confrontation.

We agree with the trial court that the deployment of the baton constituted a threat, but a single threat does not warrant an injunction, particularly where there was uncontradicted evidence that the threat was provoked by Bornemann. Gamboa did not

20

initiate any of the contacts or confrontation, and it is reasonable to assume that if Bornemann had not stopped Gamboa to accost him, the threat would not have occurred. Bornemann's testimony regarding the single incident does not establish "a course of conduct" or a pattern of activity by Gamboa such as would cause a reasonable person to suffer substantial emotional distress or support an inference that it would recur. The fact Bornemann's wife may have subjectively felt harassed by Gamboa did not excuse Bornemann's conduct, and his wife's feelings would not justify an injunction.

The evidence supports an inference that Gamboa's conduct was a reaction to successive confrontations with Bornemann in which Bornemann blocked Gamboa's car. After the second incident, both Gamboa and Bornemann made reports and sought military protective orders. Gamboa was willing to abide by the MPO; Bornemann was not: he specifically wanted an order to prevent Gamboa from having access to weapons. There is insufficient evidence to support the judgment of civil harassment against Gamboa.

4. ***The Trial Court Abused Its Discretion By Issuing an Injunction That Included a Weapon Relinquishment and By Deeming the MPO Inadequate.***

We requested supplemental briefing to address the question of whether the trial court abused its discretion by rejecting the extended MPO and subsequently ordering an injunction that included the weapon relinquishment and prohibition.

The granting or denying of injunctive relief rests within the sound discretion of the trial court and may not be disturbed on appeal except for an abuse of discretion. (*Gonzalez v. Munoz* (2007) 156 Cal.App.4th 413, 420.) The appropriate test for abuse of

discretion is whether the trial court exceeded the bounds of reason. (*Ibid.*) However, judicial discretion to grant or deny an application for a protective order is not unfettered. (*S.M. v. E.P.* (2010) 184 Cal.App.4th 1249, 1264.) The court's rejection of the MPO as inadequate, and the order for relinquishment of firearms and the prohibition against possessing firearms was an abuse of discretion.

Regarding the adequacy of the MPO, we have discussed the cross-enforceability of military and civilian protective orders in section 1. The differences between the civilian protective order and the MPO are minimal, other than the prohibition against owning or possessing firearms, which we discuss, *infra.* The court's continuance of the trial for the express purpose of obtaining an extension of the MPO that was still in effect, followed by its decision that the MPO was inadequate, is arbitrary and capricious on its face. But the court's imposition of a broad weapon prohibition overshadows this error.

In pertinent part, subdivision (t)(1) of section 527.6 of the Code of Civil Procedure provides that "[a] person subject to a protective order issued under this section shall not own, possess, purchase, receive, or attempt to purchase or receive a firearm or ammunition while the protective order is in effect." Code of Civil Procedure section 527.9, subdivision (a), requires the restrained person to relinquish firearms. Although no published cases have yet interpreted this subdivision, we consider it to be an integral part of the legislative intent to prevent threatened injury (*Scripps Health v. Marin, supra,* 72 Cal.App.4th at p. 332; *O'Toole v. Superior Court* (2006) 140 Cal.App.4th 488, 513), and to protect the individual's right to pursue safety, happiness and privacy as guaranteed by the California Constitution. (*Russell v. Douvan, supra,* 112 Cal.App.4th at p. 403.)

22

The prohibition against firearm possession is not absolute, contrary to the trial court's stated belief. Code of Civil Procedure section 527.9, subdivision (f), provides that the court may grant an exemption from the relinquishment requirements for a particular firearm if the respondent can show that a particular firearm is necessary as a condition of continued employment and the current employer is unable to reassign the respondent to another position where the firearm is unnecessary. The court was apparently unaware of the exemption provisions when it informed the parties that "bench officers are stuck with this absolute situation," and that "[i]f you give this type of order, you've got to make a general prohibits [*sic*] against weapons, possession of weapons, period."

The court's understanding was mistaken. First, Code of Civil Procedure section 527.6 does not authorize a blanket prohibition against possessing *any* type of weapon; it specifically refers only to firearms. Code of Civil Procedure section 527.9 specifies only that a court shall order that a person subject to a protective order shall relinquish any *firearm* that is in the person's immediate possession or control, or subject to that person's immediate possession or control. (Code Civ. Proc., § 527.9, subd. (b).) The court was not authorized to order the relinquishment of any other weapon.

Second, contrary to the court's understanding of the mandatory provisions of a protective order, it *did* have authority to exempt Gamboa from the requirement of relinquishing a firearm by virtue of a statutory exemption applicable where a firearm is necessary as a condition of continued employment. (Code Civ. Proc., § 527.9, subd. (f).) The court acknowledged that Gamboa's military career would be "shot" after 15 years if

23

it entered a no weapon order, and that all military personnel must be able to bear arms. As a warrant officer in the United States Army, Gamboa is required to qualify with a firearm every six months. A firearm is necessary as a condition of Gamboa's continued employment because military personnel, no less than law enforcement officers, are required to handle firearms as a condition of continued employment, if not of national defense. Preventing a military warrant officer from performing his military duties under the circumstances of this case is overkill.

The exemption pursuant to Code of Civil Procedure section 527.9, subdivision (f), was required under the circumstances of this case.

## DISPOSITION

Matters of military discipline are best left to military commanders. The judgment is reversed. Gamboa is entitled to costs.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ _____
P. J.

We concur:

HOLLENHORST _____
J.

KING _____
J.

24